## SUNSHINE ANTHRACITE COAL CO. v. NATIONAL BITUMINOUS COAL COMMISSION.

### No. 421, Original.

Circuit Court of Appeals, Eighth Circuit.
June 19, 1939.

Rehearing Denied July 8, 1939.

Henry Adamson, of Terre Haute, Ind. (George O. Patterson, Jr., and Patterson & Patterson, all of Clarksville, Ark., and Adamson, Blair & Adamson, of Terre Haute, Ind., on the brief), for petitioner.

Robert E. Sher, Sp. Asst. to Atty. Gen. (Thurman Arnold, Asst. Atty. Gen., Mr. Hugh B. Cox and Robert L. Stern, Sp. Assts. to Atty. Gen., and Robert W. Knox, General Counsel, and John W. Nance, Attorney, National Bituminous Coal Commission, both of Washington, D. C., on the brief), for respondent.

Before GARDNER and WOODROUGH, Circuit Judges, and OTIS, District Judge.

WOODROUGH, Circuit Judge.

The Sunshine Anthracite Coal Company has petitioned for a review of an order of the National Bituminous Coal Commission by which it was determined that the underlying coal in certain counties of Arkansas is bituminous coal within the meaning of the Bituminous Coal Act of April 26, 1937, 15 U.S.C.A. § 828 et seq., and by which the petitioner's coal was denied exemption from the operation and effect of the Act.

The record discloses that the Sunshine Anthracite Coal Company, petitioner herein, is a corporation engaged in the production of coal in what is known as the Spadra field, located in Johnson County, Arkansas. Practically all of its coal is sold in states other than Arkansas. On July 27, 1937, the National Bituminous Coal Commission issued its Order No. 28, providing a method whereby producers of coal might secure a determination by the Commission as to whether or not their coal is subject to the Bituminous Coal Act of 1937. On August 31, 1937, petitioner filed with the Commission an application for a certificate exempting it from the operation and effect of the Bituminous Coal Act of 1937 on the ground that the coal produced by it is not bituminous coal as defined in Section 17 of the Act, which reads in part:

"As used in this Act [subchapter]—

"(a) The term 'coal' means bituminous coal.

"(b) The term 'bituminous coal' includes all bituminous, semibituminous, and subbituminous coal and shall exclude lignite, which is defined as a lignitic coal having calorific value in British thermal units of less than seven thousand six hundred per pound and having a natural moisture content in place in the mine of 30 per centum or more."

On September 24, 1937, the Commission issued Order No. 53, directing that a public hearing be held on October 4, 1937, at Fort Smith, Arkansas, for the purpose of receiving evidence to enable the Commission to determine whether or not any part of the coal produced in Arkansas is or is not bituminous coal as defined in Section 17(b) of the Act. The Order further provided that the hearing should include a hearing on the application for exemption filed by the Sunshine Anthracite Coal Company and on any other applications for exemption filed from the State of Arkansas pur-

suant to Order No. 28. An examiner was assigned to conduct the hearing.

After notice, the hearing was held as directed on October 4, 5, and 6, 1937. At the hearing the Sunshine Anthracite Coal Company introduced evidence in support of its claim that the coal produced by it was not bituminous coal within the meaning of the Act. This evidence was to the effect that petitioner's coal is mined from what is known as the Spadra field in Johnson County, Arkansas; that coal from this field has been advertised and sold as Arkansas anthracite in various markets for a number of years; that by certain methods of classifying coals by rank on the basis of chemical analysis, including the method adopted by the American Society for Testing Materials, petitioner's coal is classified as semianthracite.

When petitioner concluded the presentation of its evidence, the examiner heard further evidence upon the question indicated by the order of hearing. This evidence tended to show the term "anthracite coal" had come to be identified in the trade as Pennsylvania anthracite; that there is a substantial difference in price between Spadra coal and Pennsylvania anthracite; that coal produced by petitioner and others from the Spadra field is sold in the various markets of the middle west in direct price competition with West Virginia Pocahontas, which is a low volatile bituminous coal; that in its physical characteristics Spadra coal more nearly resembles other bituminous coals than Pennsylvania anthracite; that Spadra coal burns with a yellowish flame, which is characteristic of bituminous, rather than with a blue flame, which is characteristic of anthracite; that the methods and appliances used in mining the coal are similar to those used in mining bituminous coal in other parts of the country and differ materially from the methods used in mining anthracite; that the miners in the Spadra field are paid on the basis of the bituminous contract of the United Mine Workers and not on the basis of the higher wage scale in effect in the anthracite field.

The evidence further showed that there were at least sixteen different methods of classification of coals by rank, on the basis of chemical analysis, under some of which petitioner's coal would be classified as bituminous and under others as semianthracite; that while, under the method of classification adopted by the American Society for Testing Materials petitioner's coal would fall in the semianthracite class, it is very close to the dividing line between semianthracite and the highest ranking bituminous coal; that the American Society for Testing Materials, which is a private organization without official status, issued certain standards as tentative in the year 1934; that such standards have been changed in certain respects from year to year until its present standards were adopted in 1937, after passage of the Bituminous Coal Act of 1937.

At the conclusion of the evidence the examiner took the matter under advisement. On January 21, 1938, he filed a report, which is dated December 3, 1937, containing proposed findings of fact and a recommendation that an order be entered declaring all coals produced in the State of Arkansas to be subject to the Bituminous Coal Act of 1937 and that petitioner's application for exemption be denied. On the same day petitioner filed with the Commission a motion for voluntary dismissal of its application for exemption. This motion was denied by the Commissioner on February 3, 1938.

Petitioner was served with a copy of the examiner's report and filed exceptions thereto. On April 28, 1938, the Commission issued a proposed report containing tentative findings of fact and a conclusion that all coal in the State of Arkansas, including that of petitioner, is subject to the Bituminous Coal Act of 1937. Petitioner was served with a copy of the proposed report and findings and given thirty days in which to file exceptions. Exceptions were filed and on July 7, 1938, counsel for petitioner appeared before the Commission, and made oral argument in support of its position.

On August 31, 1938, the Commission rendered an opinion in which it reaffirmed the position taken in its earlier report that all coals produced in Arkansas, including that of petitioner, are subject to the Act. An order was entered the same day denying petitioner's application for exemption and declaring that all coals produced in certain named counties in Arkansas are bituminous coal. Petitioner did not file any objections or exceptions to the final order of the Commission but petitioned this court for review under Section 6(b), 15 U.S.C.A. § 836(b).

The petitioner's assignments of error to this court present (1) that the Commission

was without jurisdiction; (2) that it erred in denying the petitioner's motion for voluntary dismissal; (3) that the findings and order are without substantial evidence to support them.

(1) Jurisdiction. The petitioner contends that the jurisdiction of the National Bituminous Coal Commission in fixing maximum and minimum prices, rules and regulations, is limited by the Act to coal producers who have accepted the code, and that as petitioner has not become a code member the Commission is given no power to hold a hearing and determine the class or kind of coal produced from petitioner's mines. It argues that "whether or not the coal it produces is bituminous, anthracite, semi-anthracite, lignitic or what not, is of no interest to the Commission until such time as the producer applies for membership in the Code".

The Commission has rested its jurisdiction to determine whether petitioner's coal is bituminous within the meaning of the Act upon two separate and distinct bases: (1) Upon the general power of the Commission to make all reasonable rules and regulations for carrying out the provisions of the Act[1] and (2) upon the power to grant exemptions under Section 4-A.[2]

 We think the grounds of jurisdiction relied upon by the Commission are fully sustained. They are presented as follows:

"The Bituminous Coal Act provides that the National Bituminous Coal Commission established thereunder shall proceed to fix minimum prices for coal. District boards of producers are to be organized. Section 4-I (a). These Boards, as soon as possible after their creation, are to determine from cost data submitted to them by the statistical bureaus of the Commission 'the weighted average of the total costs of the ascertainable tonnage produced in the district in the calendar year 1936.' Section 4-II (a), 7th paragraph. The Commission is then to determine from the weighted average costs submitted by the district boards the average costs of larger geographic units known as minimum price areas. Section 4-II (a), 7th paragraph. The Commission transmits the average so determined back to the district boards, and each board is required to propose minimum prices for each district so as to yield a return equal to the weighted average cost of its minimum price area. Section 4-II (a), 3rd paragraph. The prices so proposed are to be submitted to the Commission for approval, disapproval, or modification. Section 4-II (a), 5th paragraph. Prices then are to be coordinated among the various districts and the coordinated prices submitted to the Commission for approval. Section 4-II (b).

"The activities of the Commission and the district boards can not, of course, be carried on unless they know what coal is

---

[1] "Such Commission shall have the power to make and promulgate all reasonable rules and regulations for carrying out the provisions of this subchapter * * *." 15 U.S.C.A. § 829(a).

[2] "Any producer believing that any commerce in coal is not subject to the provisions of sections 831, 832 and 833 or to the provisions of the first paragraph of this section may file with the Commission an application, verified by oath or affirmation for exemption, setting forth the facts upon which such claim is based. The filing of such application in good faith shall exempt the applicant, beginning with the third day following the filing of the application, from any obligation, duty, or liability imposed by sections 831, 832 and 833 with respect to the commerce covered by the application until such time as the Commission shall act upon the application. If the Commission has reason to believe that such exemption during the period prior to action upon the application is likely to permit evasion of the subchapter with respect

to commerce in coal properly subject to the provisions of sections 831, 832 and 833 or of the first paragraph of this section, it may suspend the exemption for a period not to exceed ten days. Within a reasonable time after the receipt of any application for exemption the Commission shall enter an order granting, or, after notice and opportunity for hearing, denying or otherwise disposing of such application. As a condition to the entry of and as a part of any order granting such application, the Commission may require the applicant to apply periodically for renewals of such order and to file such periodic reports as the Commission may find necessary or appropriate to enable it to determine whether the conditions supporting the exemption continue to exist. Any applicant aggrieved by an order denying or otherwise disposing of an application for exemption by the Commission may obtain a review of such order in the manner provided in subsection (b) of section 836." 15 U.S.C.A. § 834.

subject to the Act. The very first step in the price fixing process is the determination of the weighted average cost 'of the *ascertainable* tonnage' of the coal produced in each district. Thus, at the very beginning some means of defining 'ascertainable tonnage' is necessary.

"Section 17 of the Act contains the basic definitions. But its definitions do not in themselves establish any mechanism for determining what coal comes within them.

"At the very beginning of its proceedings the Commission found itself faced with the necessity of deciding what coal was to be included within the 'ascertainable tonnage' in computing average costs. The determination had to be made in advance of other action if the Commission was to proceed. The Act did not create any other agency than the Commission capable of making it. The Commission obviously was not in a position to call upon the courts to construe the Act for it in that stage of the proceedings in order to aid it in its administrative process.

"Section 2 (a) of the Act authorizes the Commission to make all reasonable rules and regulations for carrying out the provisions of the Act. Since the Commission could not function unless the nature of the coal subject to the Act was determined, it issued its Order No. 28, which provided a procedure for determining what coal was subject to and what exempt from the statute. Subsequently it ordered a general investigation to be held as to the character of coals in Arkansas, and combined the hearing under the latter order with that on petitioner's application for exemption.

"We believe that the power of the Commission to make such orders would be implied from the inherent necessities of the situation, even if there had been no authority in the Act to make all reasonable rules and regulations. Congress obviously did not intend that the scope of operation of the Act in certain areas containing coal on the border line of the statutory definition should remain indefinitely indeterminate. The statute plainly could not be carried out unless and until it was decided which coal came within the statutory definition.

"There is ample precedent for administrative bodies determining their own juris-

diction at the commencement of the investigation of a question, subject, of course, to appropriate judicial review. In Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638, an employer sued to restrain the National Labor Relations Board from holding a hearing on a complaint of alleged unfair trade practices on the ground that the employer was not engaged in interstate or foreign commerce and therefore not within the jurisdiction of the Board. In disposing of this contention, the Court said, 303 U.S. at page 49, 58 S.Ct. at page 463, 82 L.Ed. 638:

" 'It is true that the Board has jurisdiction only if the complaint concerns interstate or foreign commerce. Unless the Board finds that it does, the complaint must be dismissed. And, if it finds that interstate or foreign commerce is involved, but the Circuit Court of Appeals concludes that such finding was without adequate evidence to support it, or otherwise contrary to law, the Board's petition to enforce it will be dismissed, or the employer's petition to have it set aside will be granted.'

"The National Labor Relations Act does not expressly authorize the Labor Relations Board to determine whether or not an employer is engaged in interstate or foreign commerce. Section 8 of that act (29 U.S.C. § 158, 29 U.S.C.A. § 158), defines certain unfair labor practices. Section 10 (a) (29 U.S.C. § 160(a), 29 U.S.C.A. § 160(a), provides that the Board is empowered to prevent any person from engaging in any unfair labor practice (listed in Section 158) affecting commerce. The term 'affecting commerce' is defined as meaning in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce. On the basis of this language the Supreme Court held that it is for the Board to determine, after notice and hearing, whether or not a particular unfair labor practice affects commerce. So here, where a determination of the character of coals in different parts of the country was a necessary incident to the performance of its other functions, the Commission was authorized to make the necessary determination.[3] Other cases in which the Supreme

---

[3] "We are not here concerned with the scope of judicial review of such deter-

minations or whether the courts may have wider latitude in reviewing when the ju-

Court has indicated that it was proper for administrative agencies to determine their own jurisdiction are Interstate Commerce Commission v. U. S. of America ex rel. Humboldt Steamship Co., 224 U.S. 474, 32 S.Ct. 556, 56 L.Ed. 849; United States ex rel. Chicago Great Western Railroad Co. v. Interstate Commerce Commission, 294 U.S. 50, 55 S.Ct. 326, 79 L.Ed. 752.

"Petitioner argues that any power the Commission may have to determine what coal is subject to its jurisdiction is limited to 'code members,' and that since it is not a code member, the Commission's authority does not extend to it. The contention is that since the Commission is authorized to fix prices only for code members,[4] there is no reason for it to be interested in the nature of the coal produced by non-code members. It is true that the Commission may only fix minimum prices for code members, and then only for sales of coal in or directly affecting interstate commerce. But the general powers of the Commission are not limited to code members. The Commission is required to base its weighted average cost figures—on which all the minimum prices ultimately rest—on the 'ascertainable tonnage' in the district, not alone on that of code members. In order that it may obtain reports on costs from all producers, Section 10 (a) of the Act authorizes the Commission to require cost reports from 'producers,' not merely from code members. Producers are defined in the Act as meaning 'all individuals, firms, associations, corporations, trustees, and receivers engaged in the business of mining coal,' whereas code members mean only 'producers accepting membership in the code.' Section 4.

"In a case involving the status of these cost reports, the only case under the Coal Act which has reached the Supreme Court, that Court held that the 'language of Section 10 (a) applies to all producers.' Utah Fuel Co. v. National Bituminous Coal Commission, 59 S.Ct. 409, 411, 83 L.Ed. 483, decided January 30, 1939.

"The Commission is thus plainly empowered to require the filing of cost reports by all producers of bituminous coal, whether code members or not. Since it must have such information as to costs from all producers, its power to determine what coal is bituminous must likewise extend to noncode members as well as to code members.

"Petitioner's suggestion that the jurisdiction of the Commission is limited to code members would lead to extremely impractical results. If the costs of only code members could be considered in computing the weighted average cost upon which prices were to be based, that average would change almost daily, whenever a new producer accepted the code. A national price structure built on such a shifting base would be an extremely unstable one. Moreover, it was obviously more desirable from the standpoint of both the public and the industry to give the minimum prices the broadest possible foundation of average cost.

"We think that the necessary power of the Commission to determine what coal comes within the Act must apply equally to code members and to noncode members. Thus, the Commission had jurisdiction both generally to investigate the status of all coal in Arkansas and specifically to determine whether petitioner's coal was subject to the Act.

"(2) What has been said demonstrates that in order to accomplish its statutory duties the Commission must have power on its own initiative to investigate the status of coal to determine whether it is subject to the Act, regardless of whether particular producers file applications for exemption. By Section 4-A of the Act Congress established a procedure specially designed to give protection to individual producers claiming to be exempt.

"The second paragraph of Section 4-A provides that any producer believing that any commerce in coal is not subject to the provisions of Section 4 or of the first paragraph of 4-A may file with the Commission an application for exemption. The filing of such an application exempts the applicant beginning with the third day thereafter from the obligations imposed by Section 4 of the Act. Within a reasonable time after receipt of an application for exemption the Commission is required to enter an order granting, or after notice and opportunity for hearing, denying or otherwise disposing of such application. An order of the Commission disposing of such ap-

---

risdictional question relates to the limits of federal constitutional power than otherwise."

[4] "Producers who do not accept the code and thereby become code members are required to pay a 19½ per cent tax on their gross sales. Section 3.

plication is reviewable in the manner provided in Section 6 (b).

"The section thus provides a complete and adequate remedy, including protection during the course of the administrative proceeding, for persons claiming to be exempt from the Act.

"The contention of petitioner that this section is not applicable to noncode members, and consequently is not applicable to it, is inconsistent with the theory on which petitioner has invoked the jurisdiction of this Court, which seems to be bottomed largely on Section 4-A. But apart from this it is plain that Section 4-A is not limited in application to code members. It provides that 'any producer' may file an application for exemption. As we have pointed out 'producer' is defined in the Act as including all producers of coal, while 'code member' is defined as meaning only those producers who accept the code. The decision of the Supreme Court in the Utah Fuel case, supra, that the word 'producer' as used in Section 10 (a) applies 'to all producers' is plainly controlling with respect to the same word as used in Section 4-A.

"The obvious purpose of Section 4-A also reflects that it was intended to apply to all producers rather than merely to code members. Congress sought to establish a procedure to enable producers to know whether they were subject to the Act. Producers who were not code members might for various reasons desire to know whether or not they were exempt before joining the code; the decision on their application for exemption might determine whether or not they would accept the code.

"In this case petitioner filed an application for exemption with the Commission. The Commission, following the procedure prescribed in the statute, held a hearing and entered an order. Petitioner now, still following the plan outlined in Section 4-A, seeks to have that order reviewed in this Court. Under these circumstances there can be no doubt as to the Commission's jurisdiction to hold the hearing and make the order involved in the review.

"As the Commission had jurisdiction to make the determination as to whether petitioner's coal was subject to the Act, the scope of judicial review of its ruling is that set forth in the recent opinion of the Supreme Court in Shields v. Utah Idaho Central R. R. Co., 305 U.S. 177, 185, 59 S.Ct. 160, 83 L.Ed. 111, decided December 5, 1938. The Court there said, 305 U.S. at page 185, 59 S.Ct. at page 165, 83 L.Ed. 111:

"'As this authority [to make the determination in question] was validly conferred upon the Commission, the question on judicial review would be simply whether the Commission had acted within its authority.' [Citing cases.]

"'The condition which Congress imposed was that the Commission should make its determination after hearing. There is no question that the Commission did give a hearing. Respondent appeared and the evidence which it offered was received and considered. The sole remaining question would be whether the Commission in arriving at its determination departed from the applicable rules of law and whether its finding had a basis in substantial evidence or was arbitrary and capricious. That question must be determined upon the evidence produced before the Commission.'

"The principles there set forth are plainly applicable here whether the Commission's authority is derived from the express language of section 4-A or the general provisions of section 2 (a).

"Section 6 (b) of the Bituminous Coal Act provides that the findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. It should be noted that in the Shields case the statute involved did not contain any such provision, so that the limitation upon the scope of judicial review there recognized a fortiori applies here."

(2) Petitioner's motion for voluntary dismissal of its petition for exemption was made on the same day that the report of the examiner was filed, though the examiner's report bears date some six weeks earlier. The petitioner's position is that it had unqualified right to dismiss. Jones v. Securities and Exchange Commission, 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015, is cited and relied on.

In order for the Commission to perform the functions required of it by the terms of the Bituminous Coal Act it was necessary that it should proceed as one of the first steps to make determination whether the coals in the counties of Arkansas were subject to the Act. The public interest in the effective administration of the Act required that to be done, irrespective of the petitions for exemption

presented by the petitioner and the two other Arkansas coal producing companies which associated themselves with the petitioner in the claims for exemption. Some of the Spadra coal producers thought their coal was bituminous within the Act, but it was recognized by all of them that a decision had to be made covering the whole field. The Commission accordingly gave the notice and caused the hearing to be had "for the purpose of receiving evidence to enable the Commission to determine whether or not any part of the coal produced in the State of Arkansas does not come within the purview of Section 17(b) of the Act." Although the petition for exemption presented by the Sunshine Anthracite was in the form of affirmative action taken by it and in the order of taking the proof at the hearing the Sunshine company presented evidence first, the real moving party seeking determination of the broad question as to the applicability of the Act to Arkansas coals was the Commission. The petitioner opposed the conclusion that all the coals in the area were within the Act. It could not by dismissing its petition prevent the Commission from making determination upon that question which was the subject matter of the hearing.

The Commission's determination set forth in the first paragraph of the order under review that all Arkansas coals, including those of petitioner, are subject to the Act, would be equally binding upon petitioner whether it withdrew from the hearing before the final decision thereon or not.

The case of Jones v. Securities and Exchange Commission, supra, does not support the petitioner's assignment of error. There Jones had withdrawn his application for registration of his securities before hearing, and the court found nothing in the record to indicate that the public or investors would be prejudiced by stopping the proceedings or dismissing the same. The court said [298 U.S. 1, 56 S.Ct. 660]: "In this proceeding, there being no adversary parties, the filing of the registration statement is in effect an ex parte application for a license to use the mails and the facilities of interstate commerce for the purposes recognized by the act. We are unable to see how any right of the general public can be affected by the withdrawal of such an application before it has gone into effect. Petitioner emphatically says that no steps had been taken looking to the issue of the securities; and this is not denied. So far as the record shows, there were no investors, existing or potential, to be affected. The conclusion seems inevitable that an abandonment of the application was of no concern to anyone except the registrant. The possibility of any other interest in the matter is so shadowy, indefinite, and equivocal that it must be put out of consideration as altogether unreal. Under these circumstances, the right of the registrant to withdraw his application would seem to be as absolute as the right of any person to withdraw an ungranted application for any other form of privilege in respect of which he is at the time alone concerned."

In this case there were other interests than those of the petitioner concerned in the hearing—the interest of the public in the effective administration of the Act, and the interests of petitioner's competitors. Some competitors who had accepted the Act were convinced that if petitioner could obtain exemption from the Act it could drive all its Arkansas competitors from the field. Although the Arkansas coal has great merit, it is hard to sell in sufficient quantity to maintain the mine organization or to provide continuous employment for the miners. The competition among the mines presents the most difficult problem of the operators, and those competitors who did not associate themselves with petitioner to deny that the Arkansas coal was within the Act were vitally concerned to have it determined that the Act applied to all alike. We find no prejudicial error in the denial of petitioner's motion to dismiss made after the conclusion of the hearing.

(3) The Evidence: The testimony before the Commission, which has been epitomized for this Court by counsel of the Commission and carefully compared and considered, included that of H. W. Collier. He has been in the coal-mining business since 1901 and at the time of the hearing was operating a mine in the Spadra field, three or four miles from petitioner's mine, taking coal of the same type from the same seam. He identified certain samples of coal taken from petitioner's mine and other mines in the same vicinity and testified that in his opinion they were all semibituminous. He testified that semibituminous is a smokeless coal and cokes very little. Anthracite coal burns with a blue flame, all other coals with a more or less

yellow flame. All Arkansas coals have a more or less yellow flame. Spadra coal does not resemble Pennsylvania anthracite in looks, hardness, or friability. Pennsylvania anthracite is much harder and less friable than Spadra or other coals in that section. Spadra coal is very similar in appearance to West Virginia Pocahontas and Paris, both of which are semibituminous. He further testified that south of Omaha, Nebraska, Spadra coal competes primarily with other coals from Arkansas and Oklahoma; north of Omaha almost entirely with Pocahontas. In the Twin Cities the retail prices of Spadra and Pocahontas are usually about the same. Spadra prices are based on the prices of other coals in the immediate vicinity and of Pocahontas; not on Pennsylvania anthracite.

Heber Denman testified that he was graduated from Lehigh University as a mining engineer in 1882 and has been operating mines in Oklahoma and Arkansas since 1898; that Spadra coal is taken from what is known as the Hartshorne seam and that coals from that seam are generally known and recognized as semibituminous. He further testified that all of the coal introduced in evidence (which included a sample from petitioner's mine) was semibituminous with the exception of Exhibit 1, which he identified as Pennsylvania anthracite. He further testified that Spadra coals compete primarily with other coals from the vicinity and with Pocahontas from West Virginia. On cross-examination he testified that there is a difference between Spadra coal and some of the other coals in Arkansas, that they differ with respect to the hardness of the coal and in the amount of fixed carbon and volatile matter, but that the difference is not sufficient to place Spadra coal in a different classification. He reiterated the opinion expressed on direct examination that Spadra coal is semibituminous.

S. A. Bramlette testified that he has been connected with the coal industry for 40 years, and that there was no anthracite or semianthracite coal in Arkansas; that Arkansas coals compete primarily with other coals from the same general area, but more particularly with West Virginia Pocahontas, which is a low volatile, high grade bituminous coal. He further testified that at one time he put on an exhibit of Spadra coal at the State Fair at Little Rock at the request of the producers of that field to demonstrate the burning quali-

ty of the coal. On the basis of his experience and observation in connection with that experiment, he testified that Spadra coal is slow in igniting, but lights with a yellowish flame, and that the yellowish flame continues until the entire mass of coal becomes a red body. He also testified that the term semianthracite denotes a lower rank of coal than anthracite, whereas the term semibituminous is the same as superbituminous and denotes a higher rank of coal than bituminous. Subbituminous is a lower rank than bituminous. He also testified that Spadra coal competes principally with West Virginia Pocahontas and not with Pennsylvania anthracite.

J. G. Puterbaugh testified he has been in the coal business for 42 years and at the time of the hearing was operating a mine at Spadra, about three-quarters of a mile from that of petitioner, taking coal from the same seam. He testified that Spadra coal has the appearance of West Virginia Pocahontas as well as of other coals produced in western Arkansas; that it is not as bright, shiny, or brittle as Pennsylvania anthracite; that wages in the Spadra mine are fixed on the basis of the bituminous wage contract of the United Mine Workers; that the price of Spadra coal is fixed on the basis of the prices of other coals produced in Arkansas. He further testified that the market for Spadra coal is in western Missouri, eastern Kansas, and eastern Nebraska, and to a larger extent in Minneapolis and St. Paul, where it competes primarily with Pocahontas. In the winter of 1936-7, the retail price of Pocahontas in Minneapolis was 90¢ a ton higher than the retail price of Spadra. On the first of September, 1937, the retail price of Pocahontas was 50¢ lower than Spadra. The prices of the two coals are very close together and fluctuate about as those figures indicate.

R. A. Young testified he has been a coal operator for 40 years and at one time was Arkansas state mine inspector; that in his opinion there was no semianthracite coal in Arkansas, and that all Arkansas coal was bituminous.

David Fowler, president of District 21 of the United Mine Workers, testified that he had been in the coal industry since he was nine years old; that he had worked in the mines for 35 years, most of the time in the anthracite fields of Pennsylvania but some of the time in various bituminous fields. He stated that he was

able to distinguish anthracite and bituminous by their appearance; that all of the coals introduced in evidence (including that from petitioner's mine) were either bituminous or semibituminous, except for Exhibit 1, which he identified as Pennsylvania anthracite. He further testified that the United Mine Workers have two basic contracts, one for bituminous and one for anthracite; that the wage scale in the Spadra field is based on the bituminous contract; that had the anthracite contract been in effect, the miners would have received three dollars a day more. He further testified that there is a great difference in the methods of mining in the anthracite fields of Pennsylvania and the methods used in the Spadra field in Arkansas.

Petitioner's president stated that they were perfectly willing to admit that they mine coal differently in the anthracite fields of Pennsylvania than they do in Arkansas, no matter what the seam.

Petitioner's Exhibit 10 shows that the prices of "Arkansas Anthracite" and of West Virginia Pocahontas in effect in Minneapolis in November, 1935, were substantially the same. Arkansas egg was $13.45 a ton; Pocahontas egg was $13.70; Arkansas stove was $13.70 a ton; Pocahontas stove was $13.40. Pennsylvania anthracite was approximately $2.50 a ton higher in price.

The Commission found, i. a.

"2. The Coal produced by petitioner and interveners is generally similar to the high-grade bituminous coals of other fields, such as the Pocahontas Smokeless coals of West Virginia. The structure is hard but not as hard as Pennsylvania anthracite coal, nor does it have the structure and appearance of anthracite. It is a low volatile coal with a high percentage of fixed carbon, but not as high as that of anthracite, and the sulphur content is high. It is mined in the same manner as bituminous coal is mined which differs materially from the methods of mining anthracite. Spadra coal, including that of petitioner and interveners is mined under the Bituminous Wage Scale which is substantially lower than the Anthracite Wage Scale. Spadra coal has the appearance of bituminous coal and its burning characteristics are similar thereto and unlike those of anthracite. Coals mined in adjoining fields have qualities comparable with the coals of the Spadra field, although they differ slightly in volatile matter and fixed carbon, but

the difference is so slight as to be unnoticeable in the merchandising thereof. The coals of adjoining producers in the Spadra field enter the same consuming markets as the coals of the petitioner and interveners in competition with one another without regard to differences in their qualities. All Spadra coals are competitive in northern markets with the Smokeless coals of West Virginia and other high-grade bituminous coals, but in no markets are they competitive with Pennsylvania anthracite."

"5. There was much expert testimony offered to the effect that all coal in the Spadra field is bituminous coal. There is noticeable agreement among all the witnesses and it is admitted by petitioner and interveners that their coal is the same as that produced by their neighbors in the same field. The great weight of the expert testimony is to the effect that all Spadra coal is bituminous, is well established as such, and has been so established over a long period of years in the various markets into which it moves."

█ █ It is the position of the Commission that it was not bound to make its determination as to the status of the coal solely on the basis of the chemical analysis of the coal calculated according to the formula adopted by the American Society for Testing Materials. Its counsel presents:

"In the first place, chemical analysis alone is not controlling. It is a factor that is entitled to consideration. In its opinion the Commission recognizes that chemical analysis, including the proper fuel ratio, is an important element to be considered. But it is not the sole factor. If Congress had intended that chemical analysis was to be the sole guide for Commission action, it is reasonable to suppose that it would have said so in plain and explicit language.

"That no one factor is controlling in determining the classification of coal is clearly indicated by the Supreme Court in Heisler v. Thomas Colliery Co., 260 U.S. 245, 43 S.Ct. 83, 67 L.Ed. 237. In that case it was argued that because anthracite and bituminous were directly competitive, it was arbitrary to classify them differently for purposes of taxation. The Court held that the mere fact of competition was not controlling, but that all other factors, such as the amount of fixed carbon, the amount of volatile matter, color, lustre, structural character, and other physical

characteristics were entitled to consideration. On the basis of all of these factors, not of any one alone, it was held that the differences in the two coals afforded a sufficient basis for classifying them differently.

"It does not appear that Congress intended that the particular formula for classifying coals by rank adopted by the American Society for Testing Materials shall be binding on the Commission.

"L. N. Plein, formerly with the Bureau of Mines and presently employed as a technician by the Bituminous Coal Commission, testified as to the history of classification of coal. He testified that since 1800 there have been many attempts to classify coal in some way or other. He named at least sixteen methods that had been put forward by different authors. He stated that all of these various methods of classifying coals are very confusing when we come to the practical side of determining what coal is and how to sell it. In 1927 the American Society for Testing Materials appointed a committee to make a study of the classification of coals. In 1934 this Committee published certain 'Tentative Specifications for Classification of Coals by Rank'. Changes were made in the tentative standards in 1935 and in 1936. During the week of September 20, 1937, the tentative standards were given final approval by the Committee.

"The A. S. T. M. formula classifies coal by rank according to fixed carbon and calorific value calculated on a mineral-matter-free basis. Under this formula the highest ranking anthracite is meta-anthracite, then anthracite, then semi-anthracite. Immediately below semianthracite is low volatile bituminous, which is the highest ranking bituminous. Semianthracite is defined as non-agglomerating coal with a fixed carbon content of between 86 and 92 per cent calculated on a dry mineral-matter-free basis. Low volatile bituminous is coal having a fixed carbon content of between 78 and 86 per cent calculated on a dry-mineral-matter-free basis. There is no such classification as semibituminous.

"It is true that under this formula, petitioner's coal would fall in the semianthracite class. Analyses of coal taken from petitioner's mine show that its fixed carbon content ranges from 86.39 to 88.04 per cent. It is just over the line between low volatile bituminous and semianthracite, almost in what might be called the twilight zone between the two.

"If the A. S. T. M. standard is controlling in the situation here presented, it can only be because Congress so intended. The Bituminous Coal Act of 1937 makes no mention of the A. S. T. M. standards. The tentative standards were first announced in 1934 and were widely accepted. Congress was either aware or unaware of the existence of such standards when it passed the Act. If it was unaware of them, it obviously could not have intended them to be controlling. If Congress was aware of the existence of the A. S. T. M. standards, the fact that it adopted an entirely different classification indicates that it did not enact that particular formula into law. The statute refers to only three kinds of bituminous coals, bituminous, semibituminous, and subbituminous; the word 'semibituminous' was used to describe the highest grade of bituminous coal. The A. S. T. M. classifies bituminous as low volatile bituminous, medium volatile bituminous, high volatile A bituminous, high volatile B bituminous, high volatile C bituminous, subbituminous A, subbituminous B and subbituminous C. It makes no mention of any such coal as 'semibituminous.' If Congress had intended the A. S. T. M. standards to govern it would either have expressly so provided, or indicated.

"That Congress did not have the A. S. T. M. classification in mind is further indicated when we consider the definition of lignite. Section 17 (b) provides that lignite shall be excluded from the Act and defines it as a lignitic coal having calorific value in British thermal units of less than seven thousand six hundred per pound and having a natural moisture content in place in the mine of 30 per cent or more. The A. S. T. M. classification defines lignite as a coal having less than eighty-three hundred moist British thermal units. Thus, even where Congress adopted a scientific test, it used one that differed from that adopted by A. S. T. M.

"But the American Society for Testing Materials is not an official body. It is not subject to governmental control. It has a constantly shifting membership. It may change its standards from day to day, from year to year. It has in fact made some changes in its standards in each of the years since the tentative standards were first put forth in 1934. Two such changes directly affecting petitioner's coal were (1)

the change from the agglutinating test to the agglomerating test for anthracite, and (2) the change in the specification for low volatile bituminous from a range of 14 to 23 per cent of volatile matter to a range of 14 to 22 per cent. Changes of even greater significance might have been made had the Society seen fit to do so. Thus, coal which is subject to the provisions of the Act on one day may be entirely free from either regulation or tax the next because of the decision of a private organization in no way interested in or concerned with the effect of their determination on the administration of the Act. Irrespective of any question of the propriety of the delegation of legislative power were the Act so construed, there is every reason for avoiding a construction so plainly out of harmony with orderly administration of law.

"We should like to point out that we have no quarrel with the method of classification adopted by A. S. T. M. It is a good method. It is entitled to weight in arriving at a definition of terms. But it is only one of many factors that must be considered. And where on every other basis except chemical analysis a coal more nearly resembles bituminous than anthracite, and where the exclusion of such coal from the provisions of the Act would give its producers an unfair competitive advantage over neighboring producers and tend to break down the orderly administration of the statute, the determination of the Commission that such coal comes under the Act was clearly justified.

"What was said by the Supreme Court with reference to the Transportation Act of 1920 in Piedmont & Northern Railway Co. v. Interstate Commerce Commission, 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115, is peculiarly appropriate here. The Court said, 286 U.S. at page 311, 52 S.Ct. at page 545, 76 L.Ed. 1115:

" 'The Transportation Act was remedial legislation, and should therefore be given a liberal interpretation; but for the same reason exemptions from its sweep should be narrowed and limited to effect the remedy intended.'

"If the Commission was authorized to consider other factors than chemical analysis in arriving at its determination, there was ample evidence, as we have already pointed out, to sustain its findings. The classification of coals is a subject requiring a specialized knowledge of the coal industry. In such a field the findings of a Commission specially created for that purpose should not be lightly disturbed on appeal.

"Petitioner makes the suggestion in its brief that Congress intended the word semibituminous to describe a grade of coal of a rank lower than bituminous. Such a definition is at variance with the dictionary definition of the word. Webster's New International Dictionary 1933. It is also at variance with the uncontradicted evidence in the record. All of the witnesses who testified with respect to it agreed that semibituminous was a higher grade than bituminous and semianthracite a lower grade than anthracite.

"Petitioner also argues that the findings of the Commission should be set aside because hearsay and other irrelevant testimony was introduced at the hearing. To this contention there are two answers.

"First. Petitioner offered no objection to the introduction of this evidence. Section 6 (b) of the Act provides that no objection to an order of the Commission shall be considered by the Court on appeal unless the objection shall have been urged below. The failure to object at the hearing before the examiner precludes petitioner from raising such objection here.

"Second. The fact that incompetent or irrelevant evidence got into the record is immaterial if there was competent evidence in the record to sustain the findings. This follows from the language of Section 6 (b), which provides that the findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. In disposing of a similar contention in Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126, the Supreme Court said:

" 'The companies urge that the Board received "remote hearsay" and "mere rumor". The statute provides that "the rules of evidence prevailing in courts of law and equity shall not be controlling". The obvious purpose of this and similar provisions is to free administrative boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order. Interstate Commerce Commission v. Baird, 194 U.S. 25, 44, 24 S.Ct. 563, 568, 48 L.Ed. 860; Interstate Commerce Commission v. Louisville &

Nashville R. R. Co., 227 U.S. 88, 93, 33 S.Ct. 185, 187, 57 L.Ed. 431; United States v. Abilene & Southern Ry. Co., 265 U.S. 274, 288, 44 S.Ct. 565, 569, 68 L.Ed. 1016; Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 442, 50 S.Ct. 220, 225, 74 L. Ed. 524.'

"In that case the Court found from an examination of the record that it contained substantial evidence to support the Board's findings. The rest was disregarded. We have already demonstrated that there is ample competent evidence in the record in this case to sustain the Commission. If there be some evidence in the record that would not be strictly admissible in a judicial proceeding, it is immaterial.

"We do not mean to indicate by the above statement that the Commission might not properly consider evidence that would not be admissible in a court of law under a strict application of the rules of evidence. The same rules of evidence plainly do not apply under the more flexible administrative procedure. But in view of the amount of judicially competent evidence supporting the Commission's determination, we do not feel it necessary to rely on any other testimony or to argue as to its admissibility."

We think the position of the Commission is sustained by the foregoing considerations and that its findings were based on substantial evidence appearing in the record.

We also sustain the claim of the Commission that its findings were appropriate to the testimony and the questions presented. In its opinion, the Commission found:

"(1) That petitioner's mine is in the Spadra field in the Hartshorne seam in Arkansas and that its coal competes with bituminous coals from other fields in the district.

"(2) That petitioner's coal is similar in structure and appearance to high grade bituminous coals from other fields such as Pocahontas from West Virginia; that in the manner of mining and in its burning characteristics it is similar to bituminous and unlike anthracite; that the miners are paid on the basis of the bituminous wage scale which is lower than the anthracite wage scale; that Spadra coals compete in the same consuming markets with the coals of adjoining producers and with high grade bituminous coals from West Virginia, but are not competitive with Pennsylvania anthracite.

"(3) That the great weight of the expert testimony is to the effect that all Spadra coal is bituminous.

"(4) That approximately 98 per cent of petitioner's production is exported from Arkansas."

After considering and disposing of petitioner's contention that the method of classification of coals by rank promulgated by the American Society for Testing Materials is controlling, the Commission goes on to state:

"The evidence in the record herein shows that the coals of petitioner and intervenors fall short of the description of anthracite and clearly come within the definition of bituminous as the two coals are distinguished and defined in the Heisler case, supra.

"While the chemical analysis, including the proper fuel ratio, is an important element to be considered, other necessary factors for a proper ranking of coals are physical features or structure and burning characteristics. This Commission, and the former Commission, found it impossible to classify coals upon chemical analysis alone, and since the contention of the petitioner and intervenors stands solely upon chemical analysis, and because of other reasons herein stated, their petition must fall.

\* \* \*

"To achieve the broad social and economic objectives of the Act, and to place the administration thereof upon a practical basis, we must consider not only chemical analyses, physical structure, and burning characteristics, but also competitive market conditions, uses, and historical circumstances.

\* \* \*

"For all practical purposes, the coals produced from the Hartshorne Seam, including the Spadra and adjoining fields and the coals of the petitioner and intervenors, are the same as the coals of their competitors and all is bituminous coal as contemplated in Section 17 (b) of the Act and we so hold."

It is clear from the above language that the basis of the Commission's decision is that chemical analysis, while important, is not the sole criterion and that other important considerations are the physical structure, burning characteristics, competitive marketing conditions and uses, and historical circumstances. It was on the basis of all these criteria that the Com-

mission reached the conclusion that petitioner's coal is subject to the Act.

In conjunction with the findings and orders, the Commission rendered its opinion (Docket 68 F. D. August 31, 1938) in which it summarized the facts found by it and analyzed and discussed the evidence before it and referred to the court decisions upon which it relied in reaching its conclusions of law.

It appeared to the Commission that Congress had not defined the coals intended to be regulated by the Bituminous Coal Act with such absolute particularity as to leave no room for construction in order to arrive at the true legislative intent. The Commission could not therefore establish "what is bituminous coal" for all cases. It considered the legislative history and the manifest object and purposes of the Act as disclosed in the "Declaration" and several provisions thereof. Its conclusion that the intent of the Act was to exclude from its operation "anthracite" and "lignitic" coals, and that such coals as those produced in Arkansas were within the Act was fully justified.

We are not persuaded that the Commission failed to find the basic facts necessary to the determination that the coal produced by petitioner was bituminous coal within the Act. The Commission was not required to draw a hard and fast line that would be applicable to all future cases in all conceivable circumstances. It found the basic facts applicable to the situation before it and rested its conclusion thereon. That is all that is required of findings of fact made by administrative agencies.

The Supreme Court on occasion has sent cases back to the trial courts because of the failure of such courts to make sufficiently detailed findings of fact. See Interstate Circuit v. United States, 304 U. S. 55, 58 S.Ct. 768, 82 L.Ed. 1146. We know of no case where the Court has refused to pass upon the merits because the findings of fact were too detailed. The most that can be said against the Commission's findings is that they are possibly more detailed than was necessary. Such a defect is not one that caused any injury to the petitioner. As long as the necessary findings are there, the rest can be treated as mere surplusage.

We find that the petitioner was accorded a full, fair and impartial hearing by the Commission, that there was no procedure taken prejudicial to it, that the findings were based on substantial evidence, and that the orders complained of were within the Commission's jurisdiction.

Affirmed.