SUNSHINE ANTHRACITE COAL CO. *v.* ADKINS,
COLLECTOR OF INTERNAL REVENUE.

No. 804.   Argued April 29, 1940.—Decided May 20, 1940.

382

See also 31 F. Supp. 125 and 105 F. 2d 559.

*Mr. Henry Adamson,* with whom *Mr. George O. Patterson* was on the brief, for appellant.

384

*Attorney General Jackson,* with whom *Solicitor General Biddle, Assistant Attorney General Arnold,* and *Messrs. Robert L. Stern, Robert E. Sher, Hugh B. Cox,* and *Abe Fortas* were on the brief, for appellee.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The labor provisions of the Bituminous Coal Conservation Act of 1935 (49 Stat. 991) were held unconstitutional by this Court in *Carter* v. *Carter Coal Co.*, 298 U. S. 238. The Bituminous Coal Act of 1937 (50 Stat. 72) was thereupon enacted. It eliminated those provisions of the earlier Act and made other substantive and structural changes.[1] The basic problem here involved is the constitutionality of the 1937 Act.

That Act provides for the regulation of the sale and distribution of bituminous coal by the National Bituminous Coal Commission,[2] with the coöperation of the bi-

---

[1] H. Report No. 294, 75th Cong., 1st Sess., pp. 2–3.

[2] Though we refer throughout to the Commission, it should be noted that its functions have been administered since July 1, 1939, by the Bituminous Coal Division of the Department of the Interior. Reorganization Plan No. II, § 4 (a) and (b), submitted by the President to the Congress May 9, 1939. Pub. Res. No. 20, 76th Cong., 1st Sess., c. 193, approved June 7, 1939.

tuminous coal industry. Its aim is the stabilization of the industry primarily through price-fixing and the elimination of unfair competition. It is provided in § 4 that the coal producers, accepting membership, shall be organized under the Bituminous Coal Code. Some twenty district boards of code members are provided for, which are to operate as an aid to the Commission but subject to its pervasive surveillance and authority. The statute specifies in detail the methods of their organization and operation, the scope of their functions, and the jurisdiction of the Commission over them. The Commission is empowered to fix minimum prices for code members in accordance with stated standards. Under § 4, II (a) each board shall "on its own motion or when directed by the Commission" propose minimum prices pursuant to prescribed statutory standards. These may be approved, disapproved, or modified by the Commission as the basis for the coördination of minimum prices. Somewhat comparable machinery is provided for such coördination of minimum prices "in common consuming market areas upon a fair competitive basis," § 4, II (b), and for establishment of rules and regulations incidental to the sale and distribution of coal by code members. § 4, II (a). The Commission is also given power by § 4, II (c) to establish maximum prices for code members pursuant to standards prescribed therein. The sale, delivery, or offer for sale of coal below the minimum or above the maximum prices established by the Commission is made a violation of the code. § 4, II (e). So are numerous practices, specified in § 4, II (i) as unfair methods of competition. And contracts for the sale of coal at prices below the prescribed minimum or above the maximum are invalid and unenforceable. § 4, II (e). The Commission may, after hearing, revoke the code membership of any coal producer for willful violation of the code or of any regulation made thereunder. § 5 (b).

Sec. 3 (a) imposes an excise tax of 1 cent per ton of two thousand pounds upon the sale or other disposition by the producer of bituminous coal produced in the United States.[3] Sec. 3 (b) imposes an additional $19\frac{1}{2}\%$ tax (based on sale price or in certain cases on fair market value) on sales of bituminous coal by producers "which would be subject to the application of the conditions and provisions of the code provided for in section 4, or of the provisions of section 4–A."[4] Producers who are members of the code are exempt from that tax. As we shall see, the interpretation of § 3 (b) is a subject of controversy. But if, as the government contends, the $19\frac{1}{2}\%$ tax is applicable to sales by non-members, there are strong inducements for joining the code.

Machinery is provided in § 4–A for obtaining exemptions. A producer who believes that any commerce in coal is not, or may not be made, subject to the provisions of § 4 may file an application for exemption with the Commission. Subject to qualifications not material here, the filing of such application "in good faith" exempts the applicant from any "obligation, duty or liability" imposed by § 4 pending action by the Commission on the application. The Commission shall grant the application, or,

[3] These provisions are now found in § 3520 of the Internal Revenue Code. (53 Stat. 430). The 1¢ tax was apparently designed to cover the administrative costs of the Act. See H. Report No. 294, *supra* note 1, pp. 2–3, recommending a $\frac{1}{2}\%$ tax which in conference was changed to 1¢ per ton. H. Report No. 578, 75th Cong., 1st Sess., p. 5.

[4] Sec. 4, as we have seen, governs the constitution and operation of the code. Sec. 4–A provides, *inter alia*, that the Commission shall subject coal in intrastate commerce to the provisions of § 4 if it finds after hearing that transactions in that coal "cause any undue or unreasonable advantage, preference, or prejudice as between persons and localities in such commerce on the one hand and interstate commerce in coal on the other hand, or any undue, unreasonable, or unjust discrimination against interstate commerce in coal, or in any manner directly affect interstate commerce in coal."

after notice and opportunity for hearing, shall deny or otherwise dispose of it. An applicant aggrieved by such denial or other disposition may obtain a review of the order in the Court of Appeals for the District of Columbia or in the Court of Appeals in the circuit where he resides or has his principal place of business. § 6 (b). The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive.

Appellant is lessee of coal lands in Arkansas and is engaged in the business of mining and shipping coal. It has not subscribed to or accepted the provisions of the Bituminous Coal Code provided for in § 4 of the Act. In August 1937 it filed an application for exemption on the grounds that its coal was not bituminous coal as defined in § 17 (b) of the Act.[5] The Commission held a public hearing on that application in October 1937.[6] Appellant appeared, introduced evidence, and was heard on oral argument before the Commission.[7] In August 1938 the Commission handed down an opinion with findings of fact and conclusions of law and entered an order denying appellant's application for exemption on the grounds that its coal was bituminous within the meaning

---

[5] Sec. 17 (b) provides: "The term 'bituminous coal' includes all bituminous, semibituminous, and subbituminous coal and shall exclude lignite, which is defined as a lignitic coal having calorific value in British thermal units of less than seven thousand six hundred per pound and having a natural moisture content in place in the mine of 30 per centum or more."

[6] This hearing was not restricted to appellant's application. Other producers in the same field intervened.

[7] The liberal notice and opportunity to be heard afforded appellant are illustrated by the following: In January 1938 the report of the examiner was served on appellant. In May 1938 a proposed report of the Commission was issued giving appellant 30 days to file exceptions and briefs and in that event to apply for oral argument. Appellant filed exceptions and asked for oral argument. Notice of oral argument was issued and oral argument was had. Thereafter the Commission issued its order denying the application.

of § 17 (b). Appellant obtained a review of this order in the Circuit Court of Appeals. That court held that the Commission had jurisdiction to determine the status of coal claimed to be exempt and that the Commission's decision was based on substantial evidence. It accordingly affirmed the order. *Sunshine Anthracite Coal Co.* v. *National Bituminous Coal Commission,* 105 F. 2d 559. We denied certiorari. 308 U. S. 604.

In May 1938, while the above proceeding was pending before the Commission, appellee demanded that appellant pay the taxes, penalties and interest accruing under § 3 (b) of the Act for the period ending February 1938; and filed a notice of tax lien against appellant's property. Thereupon appellant filed its complaint in this suit to enjoin the collection of the tax. A three-judge court was convened, which issued a temporary injunction. Apparently no further action was taken in this case until after the decision of the Circuit Court of Appeals in *Sunshine Anthracite Coal Co.* v. *National Bituminous Coal Commission, supra,* when appellee filed a supplemental answer stating that the decision in that case was *res judicata* as to the status of appellant's coal under the Act and that the district court had no jurisdiction over that subject matter. The court below denied appellant's motion to strike that portion of the answer. 31 F. Supp. 125. The case was tried. The court held the Act to be constitutional and dismissed the bill on the merits.[8] The case is here on appeal (50 Stat. 752; 28 U. S. C. § 380a).

I. Appellant argues that it is not subject to the 19½% tax imposed by § 3 (b) because that section does not ap-

---

[8] It granted, however, a permanent injunction against collection of taxes prior to December 4, 1939 the date on which this Court denied a petition for rehearing on the petition for certiorari. 308 U. S. 638. Appellee has not appealed from that part of the decree. The Court also granted a stay with respect to collection of taxes accruing after December 4, 1939, pending final disposition of this appeal.

ply to producers who are not members of the code. Its argument rests on the construction of § 3 (b) and § 4. As we have seen, the former places the 19½% tax on the sale or other disposition of coal "which would be subject to the application of the conditions and provisions of the code provided for in section 4, or of the provisions of section 4-A." Sec. 4 provides that the "provisions of such code shall apply only to such code members." Appellant therefore contends that the tax is not applicable to its coal, since the coal produced by a non-code producer such as appellant is not subject to the provisions of the code.

But if the 19½% tax is not applicable to non-code members, it is not applicable to anyone since § 3 (b) exempts code members from that tax. That construction would read the 19½% tax out of the Act. The essential sanction of the Act would then disappear and its effectiveness would be seriously impaired. That alternative will not be taken where a construction is possible which will preserve the vitality of the Act and the utility of the language in question. See *Armstrong Paint & Varnish Works* v. *Nu-Enamel Corp.*, 305 U. S. 315, 333 and cases cited. Only a highly strained construction of § 3 (b) would lead to the conclusion that non-code members are exempt from the 19½% tax. It seems that Congress made a deliberate choice of words when it said that the tax applied to the sale or other disposition of coal which "would be" subject to § 4 and § 4–A. Sec. 4 is made expressly applicable "only to matters and transactions in or directly affecting interstate commerce in bituminous coal." Hence it seems plain that the tax was intended to apply only to those *sales* by non-code members which "would be" subject to *regulation* under § 4. Appellant's coal plainly falls in that class since practically its entire output is sold to purchasers outside the state of Arkansas. To sustain appellant's position we would not only have to substitute "is" for "would be"; we would have to override the express Congressional

plan to make the 19½% tax "in aid of the regulation of interstate commerce" in bituminous coal.[9] That would be not only to rewrite § 3 (b) but to remake the whole statutory scheme. Obviously such a task is not for the courts.

II. Appellant challenges the constitutionality of the Act on the grounds that the 19½% tax is not a tax but a penalty, that Congress lacks the power to fix minimum prices for bituminous coal sold in interstate commerce, that there has been an invalid delegation of legislative and judicial power, and that the division of bituminous coal into code and non-code classes is improper.

Clearly this tax is not designed merely for revenue purposes. In purpose and effect it is primarily a sanction to enforce the regulatory provisions of the Act. But that does not mean that the statute is invalid and the tax unenforceable. Congress may impose penalties in aid of the exercise of any of its enumerated powers. The power of taxation, granted to Congress by the Constitution, may be utilized as a sanction for the exercise of another power which is granted it. *Head Money Cases,* 112 U. S. 580, 596. And see *Sonzinsky* v. *United States,* 300 U. S. 506. It is so utilized here.

The regulatory provisions are clearly within the power of Congress under the commerce clause of the Constitution. These provisions are applicable only to sales or transactions in, or directly or intimately affecting, interstate commerce. The fixing of prices, the proscription of unfair trade practices, the establishment of marketing rules respecting such sales of bituminous coal constitute regulations within the competence of Congress under the commerce clause. As stated by Mr. Justice Cardozo in

---

[9] H. Report, No. 294, *supra* note 1, states concerning this tax (p. 4): "Under subsection (b) a tax of 19½ percent is applied to coal which would be subject to the provisions in section 4 or the provisions of section 4A. Producers who are code members are exempt from this tax. This tax is intended to be in aid of the regulation of interstate commerce in coal provided for in sections 4 and 4A."

his dissent in *Carter* v. *Carter Coal Co., supra,* p. 326, "To regulate the price for such transactions is to regulate commerce itself, and not alone its antecedent conditions or its ultimate consequences." See *Tagg Bros. & Moorhead* v. *United States,* 280 U. S. 420. What is true of prices is true of the attachment of other conditions to the flow of a commodity in interstate channels. *Mulford* v. *Smith,* 307 U. S. 38 and cases cited. Since this power when it exists is complete in itself, *Gibbons* v. *Ogden,* 9 Wheat. 1; 196, there can be no question but that the provisions of this Act are an exertion of the paramount federal power over interstate commerce. See *United States* v. *Rock Royal Co-operative,* 307 U. S. 533.

Nor does the Act violate the Fifth Amendment. Price control is one of the means available to the states (*Nebbia* v. *New York,* 291 U. S. 502 and to the Congress (*United States* v. *Rock Royal Co-operative, supra*) in their respective domains (*Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511) for the protection and promotion of the welfare of the economy. But appellant claims that this Act is not an appropriate exercise of the Congressional power. It urges that the nature and use of bituminous coal in nowise endanger the health and morals of the populace; that no question of conservation is involved; that the ills of the industry are attributable to overproduction; that the increase of prices will cause a further loss of markets and add to the afflictions which beset the industry; and that the consuming public will be deprived of the wholesome restriction of the anti-trust laws. Those matters, however, relate to questions of policy, to the wisdom of the legislation, and to the appropriateness of the remedy chosen—matters which are not our concern. If we endeavored to appraise them we would be trespassing on the legislative domain. And if we undertook to narrow the scope of federal intervention in this field, as suggested by appellant, we would be blind to at least

thirty years of history. For a generation there have been various manifestations of incessant demand for federal intervention in the coal industry.[10] The investigations preceding the 1935 and 1937 Acts are replete with an exposition of the conditions which have beset that industry.[11] Official [12] and private [13] records give eloquent testimony to the statement of Mr. Justice Cardozo in the *Carter* case (p. 330) that free competition had been "degraded into anarchy" in the bituminous coal industry. Overproduction and savage, competitive warfare wasted the industry. Labor and capital alike were the victims. Financial distress among operators and acute poverty among miners prevailed even during periods of general prosperity. This history of the bituminous coal industry is written in blood as well as in ink.

It was the judgment of Congress that price-fixing and the elimination of unfair competitive practices were appropriate methods for prevention of the financial ruin, low wages, poor working conditions, strikes, and disruption of the channels of trade which followed in the wake of the demoralized price structures in this industry. If the strategic character of this industry in our economy and the chaotic conditions which have prevailed in it do not justify legislation, it is difficult to imagine what would. To invalidate this Act we would have to deny

---

[10] National Resources Committee, Energy Resources and National Policy (1939) pp. 41–123, 338–346, 405–423.

[11] Hearings on H. R. 8479, 74th Cong., 1st Sess.

[12] National Resources Committee, Energy Resources and National Policy, *supra* note 10; H. Rep. No. 1800, 74th Cong., 1st Sess., covering the 1935 Act; S. Rep. No. 252, H. Rep. No. 294, 75th Cong., 1st Sess., covering the 1937 Act; *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344; Third Annual Report Under the Bituminous Coal Act of 1937 (1940), pp. 4–5.

[13] Hamilton & Wright, The Case of Bituminous Coal (1926); Report of the Fifteenth Annual Meeting of the National Coal Assoc., Oct. 1934, pp. 9–11, 96–97.

the existence of power on the part of Congress under the commerce clause to deal directly and specifically with those forces which in its judgment should not be permitted to dislocate an important segment of our economy and to disrupt and burden interstate channels of trade. That step could not be taken without plain disregard of the Constitution. There are limits on the powers of the states to act as respects these interstate industries. *Baldwin* v. *G. A. F. Seelig, Inc., supra.* If the industry acting on its own had endeavored to stabilize the markets through price-fixing agreements, it would have run afoul of the Sherman Act. *United States* v. *Socony-Vacuum Oil Co., ante,* p. 150. But that does not mean that there is a no man's land between the state and federal domains. Certainly what Congress has forbidden by the Sherman Act it can modify. It may do so, by placing the machinery of price-fixing in the hands of public agencies. It may single out for separate treatment, as it has done on various occasions,[14] a particular industry and thereby remove the penalties of the Sherman Act as respects it. Congress under the commerce clause is not impotent to deal with what it may consider to be dire consequences of laissez-faire. It is not powerless to take steps in mitigation of what in its judgment are abuses of cut-throat competition. And it is not limited in its choice between unrestrained self-regulation on the one hand and rigid prohibitions on the other. The commerce clause empowers it to undertake stabilization of an interstate industry through a process of price-fixing which safeguards the public interest by placing price control in the hands of its administrative representative. *United States* v. *Rock Royal Co-operative, supra.* That was the choice which Congress made here. There is nothing

---

[14] See *United States* v. *Socony-Vacuum Oil Co., supra,* p. 225.

in the *Carter* case which stands in the way. The majority of the Court in that case did not pass on the price-fixing features of the earlier Act. The Chief Justice and Mr. Justice Cardozo in separate minority opinions expressed the view that the price-fixing features of the earlier Act were constitutional. We rest on their conclusions for sustaining the present Act.

Nor does the Act contain an invalid delegation of legislative power. Under § 4, II (c) the Commission may fix maximum prices when in the public interest it deems it necessary in order to protect the consumer against unreasonably high prices. These maximum prices must be fixed at a uniform increase above minimum prices so that in the aggregate they will yield a reasonable return above the weighted average total cost of the district. And no maximum price shall be established for any mine which will not yield a fair return on the fair value of the property. The minimum prices to be fixed must conform to the following standards: the weighted average cost for each minimum price area must be computed, the elements of cost being defined; a classification of the various sizes and grades of coal shall be made which reflects as nearly as possible the relative market value of the various kinds, qualities, and sizes of coal, which is just and equitable as between producers within the district and which has due regard to the interests of the consuming public; and coördinated minimum prices shall be established for such coal (a) which reflect as nearly as possible the relative market values at points of delivery taking into account specifically enumerated factors, (b) which preserve as nearly as may be existing fair competitive opportunities, (c) which are just and equitable as between the districts, and (d) which, consistently with the process of coördination, yield a return to each area approximating its weighted average cost per ton.

The problem of fixing reasonable prices for bituminous coal cannot be differentiated legally from the task of fixing rates under the Interstate Commerce Act (41 Stat. 484, 49 U. S. C. § 15) and the Packers and Stockyards Act (42 Stat. 166, 7 U. S. C. § 211). The latter provide the standard of "just and reasonable" to guide the administrative body in the rate-making process. The validity of that standard (*Tagg Bros. & Moorhead v. United States, supra*), the appropriateness of the criterion of the "public interest" in various contexts (*New York Central Securities Corp.* v. *United States,* 287 U. S. 12, 24; *United States* v. *Chemical Foundation,* 272 U. S. 1; *Avent* v. *United States,* 266 U. S. 127), the legality of the standard of "unreasonable obstruction" to navigation (*Union Bridge Co.* v. *United States,* 204 U. S. 364) all make it clear that there is a valid delegation of authority in this case. The standards which Congress has provided here far exceed in specificity others which have been sustained. Certainly in the hands of experts the criteria which Congress has supplied are wholly adequate for carrying out the general policy and purpose of the Act. To require more would be to insist on a degree of exactitude which not only lacks legal necessity but which does not comport with the requirements of the administrative process. Delegation by Congress has long been recognized as necessary in order that the exertion of legislative power does not become a futility. *Currin* v. *Wallace,* 306 U. S. 1, 15 and cases cited. But the effectiveness of both the legislative and administrative processes would become endangered if Congress were under the constitutional compulsion of filling in the details beyond the liberal prescription here. Then the burdens of minutiae would be apt to clog the administration of the law and deprive the agency of that flexibility and dispatch which are its salient virtues. For these reasons we hold that the standards with which Congress has supplied the Commission are

plainly valid. *United States* v. *Rock Royal Co-operative, supra.*

Nor has Congress delegated its legislative authority to the industry. The members of the code function subordinately to the Commission. It, not the code authorities, determines the prices. And it has authority and surveillance over the activities of these authorities. Since law-making is not entrusted to the industry, this statutory scheme is unquestionably valid. *Currin* v. *Wallace, supra,* and cases cited.

But appellant maintains that the delegation of authority to the Commission to determine what coal is subject to the Act is unlawful because of uncertainty in the statutory definition of bituminous coal. Sec. 17 (b) defines the term "bituminous coal" as follows:

"The term 'bituminous coal' includes all bituminous, semibituminous, and subbituminous coal and shall exclude lignite, which is defined as a lignitic coal having calorific value in British thermal units of less than seven thousand six hundred per pound and having a natural moisture content in place in the mine of 30 per centum or more."

As in the case of the term "interurban" electric railway in the Railway Labor Act (*Shields* v. *Utah Idaho Central R. Co.*, 305 U. S. 177) we think the definition of bituminous coal is wholly adequate as a standard for administrative action. The fact that it is not a chemist's or an engineer's definition is not fatal. The definition is not devoid of meaning. We are unable to say that it cannot be applied so as to delineate the areas in which Congress intended to make this system of control effective. The fact that many instances may occur where its application may be difficult is merely to emphasize the nature of the administrative problem and the reason for the grant of latitude by the Congress. The difficulty or impossibility of drawing a statutory line is one of the reasons for sup-

plying merely a statutory guide. Cf. *Piedmont & Northern Ry. Co. v. Interstate Commerce Commission,* 286 U. S. 299, 312. That guide is sufficiently precise for an intelligent determination of the ultimate questions of fact by experts.

Nor is there an invalid delegation of judicial power. To hold that there was would be to turn back the clock on at least a half century of administrative law. The question of whether or not appellant should be subjected to the regulatory provisions of the Bituminous Coal Act was one which the Congress could decide in the exercise of its powers under the commerce clause. In lieu of making that decision itself, it could bring to its aid the services of an administrative agency. And it could delegate to that agency the determination of the question of fact whether a particular coal producer fell within the Act. *Shields v. Utah Idaho Central R. Co., supra,* p. 180. The fact that such determination involved an interpretation of the term "bituminous coal" is of no more significance here than was the fact that in the *Shields* case a decision by the Interstate Commerce Commission of what constituted an "interurban" electric railway was necessary for the ultimate finding as to the applicability of the Railway Labor Act to carriers. That problem involves no more than the adequacy of the standard governing the exercise of the delegated authority. Furthermore, on this phase of the case, appellant has received all the judicial review to which it is entitled. As we have seen, it obtained a review under § 6 (b) of the Commission's denial of its application for exemption. The functions of the courts cease when it is ascertained that the findings of the Commission meet the statutory test. *Rochester Telephone Corp. v. United States,* 307 U. S. 125, 146.

Appellant contends that the statutory classification of coal into code and non-code classes and the application

of the 19½% tax to the latter are improper under the Fifth Amendment. Its objection is not premised on lack of due process. Nor could it be in view of the elaborate machinery and procedure for the Act's enforcement which the Congress has provided. Rather appellant's objection is founded on its claim of discrimination. But the Fifth Amendment, unlike the Fourteenth, has no equal protection clause. *Steward Machine Co.* v. *Davis,* 301 U. S. 548, 584 and cases cited. And there is "no requirement of uniformity in connection with the commerce power." *Currin* v. *Wallace, supra,* p. 14. The lack of similarity in treatment of the two classes of coal is an integral and essential feature of this Act. As we have said, it is through that device that Congress sought to obtain an effective sanction for the Act's enforcement. Coercion is the very essence of any penalty exacted for failure of submission. "It is of the essence of the plenary power conferred" by the commerce clause "that Congress may exercise its discretion in the use of the power." *Currin* v. *Wallace, supra,* p. 14. A part of that discretion is the selection of the sanction for the law's enforcement. Discrimination constitutionally may be the price of non-compliance. "Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts." *Sonzinsky* v. *United States, supra,* pp. 513–514. And see *Mulford* v. *Smith, supra,* p. 48.

III. Appellant contends here, as it did below, that *Sunshine Anthracite Coal Co.* v. *National Bituminous Coal Commission, supra,* is not determinative of the present issues since that case did not involve the assessment of taxes and since the Commission had no authority to determine the status of appellant's coal.

These contentions are untenable. In the first place, the Commissioner of Internal Revenue is merely the agency to collect taxes levied under the Act; he is not the

administrative agent whom Congress has designated to determine · what coal is exempt from the 19½% tax. That function is entrusted to the Commission. By the terms of § 4–A it is the Commission which determines whether an application for exemption should be granted or denied. By the provisions of § 3 (b) it is the Commission which certifies to the Commissioner those who are code members and consequently exempt from the 19½% tax. Hence the Commission determines the scope of the provisions of the Act and their applicability to various producers. The Commissioner is given no administrative functions whatsoever except tax collection. In the second place, the underlying issue in each of these two suits is the same. In *Sunshine Anthracite Coal Co.* v. *National Bituminous Coal Commission, supra,* the question was whether or not appellant's coal was "bituminous" within the meaning of § 17 (b). When that issue was decided adversely to appellant, liability for the 19½% tax followed unless appellant joined the code, in which event it would be entitled to a certificate from the Commission evidencing its tax exemption. In the present suit, appellant is seeking to raise the identical issue, since its purpose is to enjoin collection of the self-same tax.

The result is clear. Where the issues in separate suits are the same, the fact that the parties are not precisely identical is not necessarily fatal. As stated in *Chicago, R. I. & P. Ry. Co.* v. *Schendel,* 270 U. S. 611, 620, "Identity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, in legal effect, different, . . . and parties nominally different may be, in legal effect, the same." A judgment is *res judicata* in a second action upon the same claim between the same parties or those in privity with them. *Cromwell* v. *County of Sac,* 94 U. S. 351. There is privity between officers of the same government so that a judg-

ment in a suit between a party and a representative of the United States is *res judicata* in relitigation of the same issue between that party and another officer of the government. See *Tait* v. *Western Maryland Ry. Co.,* 289 U. S. 620. The crucial point is whether or not in the earlier litigation the representative of the United States had authority to represent its interests in a final adjudication of the issue in controversy. Cf. *Gunter* v. *Atlantic Coast Line R. Co.,* 200 U. S. 273, 284–289. Cases holding that a judgment in a suit against a collector for unlawful exaction is not a bar to a subsequent suit by or against the Commissioner or the United States (*Sage* v. *United States,* 250 U. S. 33; *Bankers Pocahontas Coal Co.* v. *Burnet,* 287 U. S. 308) are not in point, since the suit against the collector is "personal and its incidents, such as the nature of the defenses open and the allowance of interest, are different." *Sage* v. *United States, supra,* p. 37. But here the authority of the Commission is clear. There can be no question that it was authorized to make the determination of the status of appellant's coal under the Act. It represented the United States in that determination and the delegation of that power to the Commission was valid, as we have said. That suit therefore bound the United States, as well as the appellant. Where a suit binds the United States, it binds its subordinate officials. *Tait* v. *Western Maryland Ry. Co., supra.* The suggestion that the doctrine of *res judicata* does not apply unless the court rendering the judgment had jurisdiction of the cause is sufficiently answered by *Stoll* v. *Gottlieb,* 305 U. S. 165 and *Treinies* v. *Sunshine Mining Co.,* 308 U. S. 66. As held in those cases, in general the principles of *res judicata* apply to questions of jurisdiction as well as to other matters—whether it be jurisdiction of the subject matter or of the parties. Accordingly the lower court correctly held that it had no jurisdiction to determine

whether appellant's coal was "bituminous" as defined in the Act. Furthermore where, as here, Congress has created a special administrative procedure for the determination of the status of persons or companies under a regulatory act and has prescribed a procedure which meets all requirements of due process, that remedy is exclusive. See *Anniston Manufacturing Co.* v. *Davis,* 301 U. S. 337.

The decree below subjected appellant to payment of taxes accrued or assessed against it under § 3 (b) after December 4, 1939. To relieve against payment of taxes until final termination of the litigation would be to put a premium on dilatory tactics in a situation where under the authority of *Currin* v. *Wallace, Mulford* v. *Smith,* and *United States* v. *Rock Royal Co-operative, supra,* the subject of the Act was clearly one over which the jurisdiction of Congress was complete.

*Affirmed.*

MR. JUSTICE MCREYNOLDS is of opinion that the Act under review is beyond any power granted to Congress and that the judgment below should be reversed.