## COSTANZO COAL MIN. CO. v. WEIRTON STEEL CO.
### No. 5356.

Circuit Court of Appeals, Fourth Circuit.

July 26, 1945.

Writ of Certiorari Denied Nov. 5, 1945.

See 66 S.Ct. 147.

---

Gordon D. Kinder, of Martins Ferry, Ohio (George A. Blackford, of Wheeling, W. Va., on the brief), for appellant.

John E. Laughlin, Jr., of Pittsburgh, Pa. (Carl G. Bachmann, of Wheeling, W. Va., and Thorp, Bostwick, Reed & Armstrong, of Pittsburgh, Pa., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This appeal is from a judgment for the defendant in a suit brought by Costanzo Coal Mining Company against Weirton Steel Company to recover the difference between the contract price paid by the defendant for coal delivered and the minimum price established by the Bituminous Coal Division of the Department of the Interior under authority of the Bituminous Coal Act of 1937, 50 Stat. 72, 15 U.S.C.A. § 828 et seq. The claim is based on sales between October 1, 1940 and March 23, 1941; and the amount involved is alleged to be $176,116.24 with interest. The case was tried without a jury upon an agreed statement of facts.

The Bituminous Coal Act of 1937 was enacted after the Bituminous Coal Act of 1935, 49 Stat. 991, had been declared unconstitutional in Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160. The taxing provisions and the price fixing provisions of the Act of 1937 were held to be constitutional in Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263. The Act of 1937 [1] established the National Bituminous Coal Commission [2] and gave it authority to organize codes composed of producers accepting membership therein, and to administer the unfair competitive practice prohibitions of the Act, and to prescribe maximum and minimum prices to be observed by code members. The Commission was authorized to prescribe maximum discounts or price allowances that might be made by code members to persons, whether or not code members, referred to as distributors, who purchase coal for resale·and resell it at not less than cargo or railroad carload lots, and to require the maintenance and observance by such persons in the resale of such coal of the prices and marketing rules and regulations established under the Act. Sections 2, 4, Part I and 4, Part II, 15 U.S.C.A. §§ 829, 832 and 833.

A tax of 1c per ton on all sales of bituminous coal was levied by § 3(a) of the Act, 15 U.S.C.A. § 830(e), and an additional tax of 19½ per cent of the selling price of coal sold by non-members was imposed by § 3(b) of the Act, 15 U.S.C.A. § 830(b), thus insuring membership in and compliance with the minimum price provisions of the Code.

Section 4, Part II(e) of the Act, 15 U.S.C.A. § 833(e), contains the following provisions:

[1] The Act has now expired. By § 19 of the Act, 15 U.S.C.A. § 849, the termination of the Act was fixed at April 26, 1941. Before expiration this date was extended to May 24, 1943 and then to August 24, 1943. See note 15 U.S.C.A. § 849.

[2] The Commission was abolished and its duties and functions were transferred to the Bituminous Coal Division of the Department of the Interior by Reorganization Plan No. II § 4(a) and (b) of July 1, 1939, 53 Stat. 1431, 4 Fed.Reg. 2731, 5 U.S.C.A. following section 133t.

"No coal subject to the provisions of this section shall be sold or delivered or offered for sale at a price below the minimum or above the maximum therefor established by the Commission, and the sale or delivery or offer for sale of coal at a price below such minimum or above such maximum shall constitute a violation of the code: Provided, That the provisions of this paragraph shall not apply to a lawful and bona fide written contract entered into prior to June 16, 1933.

"The making of a contract for the sale of coal at a price below the minimum or above the maximum therefor established by the Commission at the time of the making of the contract shall constitute a violation of the code, and such contract shall be invalid and unenforceable.

"From and after April 26, 1937, until prices shall have been established pursuant to subsections (a) and (b) of this. section, no contract for the sale of coal shall be made providing for delivery for a period longer than thirty days from the date of the contract. * * *"

Section 4-A, 15 U.S.C.A. § 834 provides:

"Whenever the Commission upon investigation instituted upon its own motion or upon petition of any code member, district board, State or political subdivision thereof, or the consumers' counsel, after hearing finds that transactions in coal in intrastate commerce by any person or in any locality cause any undue or unreasonable advantage, preference, or prejudice as between persons and localities in such commerce on the one hand and interstate commerce in coal on the other hand, or any undue, unreasonable, or unjust discrimination against interstate commerce in coal, or in any manner directly affect interstate commerce in coal, the Commission shall by order so declare and thereafter coal sold, delivered or offered for sale in such intrastate commerce shall be subject to the provisions of section 4 [sections 831, 832 and 833.]"

Both plaintiff and defendant are West Virginia corporations. On March 20, 1933 they entered into a contract wherein plaintiff agreed to sell to the defendant coal which was used to fire defendant's boilers and furnaces for the manufacture of steel. The contract recited that the amount of coal to be purchased was 90 per cent of defendant's requirements; that the coal was to be produced at and delivered from. the Richland mine at Wheeling, West Virginia; that the coal was to be of a grade known as slack coal and that deliveries, which were to be by barge, were to be confined to the period between April 1, 1933, and April 1, 1934, "with renewal privilege for period of two years, each upon written notice by purchaser thirty days prior to April 1, 1934." The contract price fixed by the agreement was $.70 per ton and it was declared that "said price being based on present mining and day wage scale of our mine workers, shall be subject to any change authorized by the government, the enactment of any state or national taxation laws affecting same, or increases granted our mine workers * * *. This price subject to adjustment to be mutually agreed upon after April 1, 1934."

This contract was extended by the parties without modification °for successive periods of two years each until December 2, 1939, when coal of a different size and grade from the strip mine of the Cove Hill Coal Company was substituted for· coal from the Richland mine. Transportation by truck was substituted for transportation by barge. The price was raised from $.70 to $1.10 per ton. A final extension of the contract for two years was made by letters between the parties on February 27 and February 29, 1940.

■ The original contract, as modified, was considered by the parties to be in effect throughout the period from March 20, 1933, when it was first executed, until March 21, 1941; and hence the prices fixed by the Commission were ignored and the defendant paid for the coal delivered at prices specified by the terms of the contract. If this interpretation of the contract was correct, it was exempt from the price fixing provisions of the Act because, as we have seen, the Act expressly provides that these provisions shall not apply to a contract entered into prior to June 16, 1933. But the original contract of March 20, 1933, permitted only one renewal of two years, and hence the letters which passed between the parties in 1936 and subsequent years, purporting to renew the original contract, in effect concluded new agreements; and this was the holding of the Bituminous Coal Division in proceedings instituted in April, 1941, to revoke Costanzo's registration as a distributor under the Act on the ground that the sales made by it to the defendant after October 1, 1940, were made at a price less than the minimum price fixed by the Division under the terms of the Act. The plaintiff was registered as a distributor un

der § 4, Part II(h) of the Act, 15 U.S.C.A. § 833(h), but, as we shall see, the sales under examination were made by plaintiff as agent of the producers.

The coal sold to the defendant by the plaintiff under the agreements described was obtained by it under two contracts with producers who were code members. The first agreement dated June 1, 1933, was between the plaintiff and the Wheeling Coal Corporation. It covered a period of ten years and provided that the plaintiff should be the exclusive sales agent of the producer of coal produced at the Costanzo mine situate in Wheeling, West Virginia. It was agreed that the sales agent would not enter into any contract for the sale of coal without the knowledge of the principal and that the sales agent should receive as compensation for its services 7 per cent of the selling price of the coal and would guarantee all customers' accounts so that the principal would suffer no loss from non-payment. The second agreement, dated January 2, 1940, with the Cove Hill Coal Company contained similar provisions. The plaintiff was constituted the exclusive sales agent for all coal produced from the Three Springs and Chestnut Woods Mines. Compensation for the plaintiff's services was to be fixed from time to time by mutual agreement. The plaintiff guaranteed all customers' accounts.

Throughout the transactions between the plaintiff and the defendant, the defendant knew that the plaintiff was acting under these sales agreements with the producers although the bills and invoices were made out in the plaintiff's name and the defendant made payment for the coal to the plaintiff. It was the plaintiff's practice to remit collections to the producers after deducting its commissions.

During the same period steps were taken by the Bituminous Coal Division to put the Act into effect. On February 15, 1938, after proper notice and a hearing, the Division issued a ruling under the authority of § 4-A of the Act that sales of coal in intrastate commerce in West Virginia were subject to the minimum price requirements of § 4, pt. 2, of the Act. Subsequently by order of August 8, 1940 the Division established minimum prices to become effective on September 3, 1940, and by order of August 14, 1940, the effective date of these prices was postponed until October 1, 1940.

Notwithstanding the establishment of the minimum prices which the plaintiff and the producers as code members were bound to observe, the plaintiff continued to make sales to the defendant at the contract prices which were about one-half of the minimum prices. This practice continued from October 1, 1940, until March 21, 1941, when, at the direction of the Division, the plaintiff notified the defendant that subsequent deliveries would be made at minimum prices. Thereupon the defendant notified plaintiff that it would accept no coal except at the contract prices. Deliveries billed at the minimum prices were made on March 22 and 23, 1941, but the defendant paid only the contract price therefor and refused to make further payment. The present suit is brought to recover the difference between the contract price received and the minimum price of the coal delivered between October 1, 1940, and March 23, 1941. It is conceded that the difference is in excess of $170,000.

Five contentions are raised in opposition to the plaintiff's claim, as follows: (1) That the District Court was without jurisdiction since the parties are both corporations of the State of West Virginia and the suit did not arise under the Constitution and laws of the United States; (2) that the sales of coal described did not come within the Bituminous Coal Act because they constituted intrastate transactions; (3) that the sales of coal described did not come within the Act because the sales contract was entered into before the minimum prices were established; (4) that the Act provides no remedy against a buyer who purchases coal for less than the minimum prices; and (5) that the plaintiff was merely the agent of the producer and has no right of recovery against the defendant in its own name.

■ The basis of the contention that the District Court was without jurisdiction seems to be that the statute had no application to the transactions between the parties to the case because any right of action of the plaintiff against the defendant is necessarily founded upon the contract between them and not upon any provision of the Act. Reliance is placed on Gully v. First Nat. Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70, which held that a federal court was without jurisdiction to entertain a suit by a State tax collector for taxes against a national bank which had taken over the

assets and assumed the liabilities of another national bank against which the taxes were assessed. It was pointed out in that case that the suit was upon a contract which had its origin in the law of the State and did not arise under an Act of Congress or the Federal Constitution simply because the tax was imposed pursuant to congressional consent. The court said (pages 112, 113 of 299 U.S., page 97 of 57 S.Ct., 81 L.Ed. 70):

"How and when a case arises 'under the Constitution or laws of the United States' has been much considered in the books. Some tests are well established. To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. * * * The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. * * * A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto * * * and the controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal. * * *"

■ If this test is applied, it is clear that the District Court had jurisdiction of the present suit, for as will appear in the succeeding discussion, the decision depends upon the construction or effect to be given to the Bituminous Coal Act of 1937.

■ The second contention is readily answered by reference to the provisions of the statute and decisions which bear upon the effect of intrastate transactions upon interstate commerce. It is true that the sales and deliveries of coal under consideration in this case were completely intrastate, but it is stipulated that the coal was used by the Weirton Steel Company, the defendant, in the boilers and furnaces of its steel manufacturing plant at Weirton, West Virginia, the products of which have been largely sold and shipped to customers outside the State. The Commission, acting under the authority of §§ 4-A and 15 of the Act determined after hearing that such sales in West Virginia are subject to the minimum price requirements of the Act, and it is not disputed that such transactions directly affect interstate commerce in coal within the meaning of that phrase in the statute. It was said in Sunshine Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263, that the regulatory provisions of the statute are applicable only to sales or transactions in or directly or intimately affecting interstate commerce, and that the fixing of prices respecting such sales of bituminous coal constitute regulations within the competence of Congress under the commerce clause. It is manifest that the transactions under consideration fall within the purview of the statute. See also Natl. Labor Rel. Bd. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122.

The third contention of the defendant rests upon the fact that the contract under which the sales were made was executed in February, 1940, while the minimum prices were not fixed by the Commission until August, 1940 and did not go into effect until October, 1940. It is pointed out that the first paragraph of § 4, Part II(e) of the Act, which contains the prohibition against the sale or delivery of coal below the established minimum prices, is followed immediately by a paragraph which provides that a contract at a price below the minimum "established by the Commission *at the time of the making of the contract*" shall be invalid and unenforceable. (Italics inserted). Hence, it is said, the contract of February, 1940 is not contrary to the statute and there is no basis for the present suit.

[5, 6] We do not agree with this conclusion. Section 4, Part II(e) of the statute not only invalidates a contract which contains provisions below the minimum prices established when the contract is made, but also prohibits in Paragraph 1 the *delivery* of coal at a price below the established minimum. In other words, the statute does not permit deliveries of coal below the established minimum, even if the contract may have been made before the minimum prices were established. All the deliveries by the plaintiff after October 1, 1940, were made below the established prices except the deliveries on March 22 and 23, 1941, the last two days, and the defendant has paid only the contract price for these. Moreover, the provisions of the contract of February, 1940, were clearly violative of the third paragraph of § 4, Part II(e), because they provided for deliveries over the subsequent period of two years, while the third paragraph of the section prohibits any contract to be made

after April 26, 1937, providing for deliveries for a longer period than thirty days, until prices shall have been established by the Commission. It is clear that the contract of 1940 fell within the prohibition of this paragraph of the Act, and therefore the defendant cannot avoid an adverse judgment on the ground that the contract antedated the establishment of minimum prices.

We come then to the main defense on the merits that the statute applies to code members only and not to buyers; and that it provides no remedy or method of enforcement or cause of action against a buyer who purchases or accepts deliveries of coal at prices below the established minimum. The defendant's position is that the provisions of the statute are applicable to and binding upon a code member who is party to a contract of sale as the seller, but not upon the buyer who is the other contracting party. The argument is based in part upon the terms of § 4 which states that the provisions of the code shall apply only to code members and distributors and in part upon the terms of § 4, Part II(e), which makes sales below established prices violations of the code; and this language is thought to be important because sellers are members of the code and buyers are not. Further it is said that although sales and deliveries below the minimum and contracts for deliveries executed after April 26, 1937, are forbidden, the Act does not expressly provide that such contracts shall be invalid and unenforceable.

It is also pointed out that the remedies expressly provided for violations of the code are limited to members thereof. For example, § 5(b) empowers the Commission to revoke the membership of an offending coal producer and to revoke his exemption from the 19½ per cent tax per ton, and also empowers the Commission to make a cease and desist order against him; and § 5(d) gives a right of action with threefold damages to a code member who has been injured by any act or omission of another code member forbidden by the statute. Since no mention of buyers is made in this connection, it is inferred that no remedy against them is contemplated. It is also emphasized that while the statute was in

process of enactment, amendments proposed were rejected which would have made it a misdemeanor, punishable by a fine of one dollar per ton, for any person to purchase coal from a code member in a manner in violation of the code, and would have made any price provisions of a contract below the minimum price unenforceable.[3]

We are not impressed with the force of these arguments. The code provisions were made applicable only to code members because producers who did not choose to be members and thus became subject to the additional tax were free from price restrictions. Paragraphs 1 and 2 of § 4, Part II (e), as we have already shown, expressly forbid the sale or delivery of coal below the established price and declare that a contract for the sale of coal below the price established at the date of the contract shall be invalid and unenforceable. We do not perceive how such a contract can be invalid from the standpoint of the seller and at the same time valid as to the buyer. It was not possible to revoke the code membership of an offending buyer because the membership did not exist; and it was not deemed desirable to subject the buyer to special penalties; but these omissions from the Act are not inconsistent with the view that the buyer has no right to the protection of a contract whose provisions violate the terms and serve to defeat the purposes of the Act.

These purposes are stated in § 1 of the Act wherein it is declared that regulation of the sale and distribution of bituminous coal is imperative for the protection of interstate commerce in such coal, and that existing practices of distribution and marketing thereof waste the resources of the nation and disorganize interstate commerce therein so that regulation of prices and unfair methods of competition are necessary. The Supreme Court in considering the power of Congress to pass the Act in Sunshine Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263, made the following statement as to the conditions which gave rise to it (page 393 of 310 U.S., page 913 of 60 S.Ct., 84 L.Ed. 1263):

"And if we undertook to narrow the scope of federal intervention in this field, as suggested by appellant, we would be blind to at least thirty years of history. For a

---

[3] In Kanawha & Hocking Coal & Coke Co. v. United States, 101 Ct.Cl. 96, it was decided that the United States was obligated to pay the established minimum price under the terms of a contract with the producer, but the contention now under consideration was not passed upon.

936

generation there have been various manifestations of incessant demand for federal intervention in the coal industry. The investigations preceding the 1935 and 1937 Acts are replete with an exposition of the conditions which have beset that industry. Official and private records give eloquent testimony to the statement of Mr. Justice Cardozo in the Carter case (Carter v. Carter Coal Co., 298 U.S. 238, page 330, 56 S.Ct. [855], 80 L.Ed. 1160) that free competition had been 'degraded into anarchy' in the bituminous coal industry. Overproduction and savage, competitive warfare wasted the industry. Labor and capital alike were the victims. Financial distress among operators and acute poverty among miners prevailed even during periods of general prosperity. This history of the bituminous coal industry is written in blood as well as in ink."

It is our view that a buyer who received deliveries of coal at prices specified in a contract below the legal minimum was not protected by the contract but was subjected to the liabilities imposed by his acceptance of goods whose price was fixed by the statute. Since the contract of February, 1940, providing for a delivery over a period of two years, was invalid as to both parties and the payment for the coal delivered at the contract price was in violation of law, there arose upon the acceptance of the goods by the buyer an implied contract on its part to pay for them at the price established by lawful authority. It is true that "a contract implied in fact is one inferred from the circumstances or acts of the parties; but an express contract speaks for itself and leaves no place for implications." Klebe v. United States, 263 U.S. 188, 192, 44 S.Ct. 58, 59, 68 L.Ed. 244. In the pending case, however, the express contract was invalid and without legal effect, and hence the buyer, having received the goods, must pay for them at the established minimum price.

It is objected that even if this be true, the buyer's obligation is not enforceable at the suit of a seller who was party to the illegal agreement and, therefore, a wrongdoer, who is not entitled to the aid of the court. Ordinarily it is true that in the interests of the public welfare a court will not give aid to one who founds his complaint upon an unlawful act to which he is a party; but here the right to recovery is permissible because it will promote the higher right of the public to effectuate the

purposes of the statute. The applicable rule in such case is thus stated in Restatement of Contracts, Vol. 2, § 601:

"If the refusal to enforce or to rescind an illegal bargain would produce a harmful effect on the parties for whose protection the law making the bargain illegal exists, enforcement or rescission, whichever is appropriate is allowed."

In 5 Williston, Contracts, Rev.Ed., § 1632, it is said:

"In some cases where a refusal to enforce an agreement would produce the very effect which the law seeks to guard against, a corporation is allowed to enforce it, although it was particularly prohibited and made illegal."

See also, Steele v. Drummond, 275 U.S. 199, 205, 48 S.Ct. 53, 72 L.Ed. 238; In re Builders' Finance Ass'n, D.C.S.D.Cal., 26 F.2d 123, 125; 12 Am.Jur., Contracts, § 214; 17 C.J.S., Contracts, § 278a.

In principle there is no substantial distinction between the obligation of the purchaser of bituminous coal to pay the minimum price established by the Commission and the obligation resting upon a shipper of goods to pay the scheduled freight charges fixed under the provisions of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. In both cases, the charge is established by lawful authority to effectuate a public purpose deemed desirable by the legislative body. The obligation of the shipper is aptly described in the following passage from Pittsburgh, etc., Ry. Co. v. Fink, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151, which applies with equal force to the defendant in the pending case. The court said (pages 581, 582 of 250 U.S., page 28 of 40 S.Ct., 63 L.Ed. 1151):

"* * * It was, therefore, unlawful for the carrier upon delivering the merchandise consigned to Fink to depart from the tariff rates filed. The statute made it unlawful for the carrier to receive compensation less than the sum fixed by the tariff rates duly filed. Fink, as well as the carrier, must be presumed to know the law, and to have understood that the rate charged could lawfully be only the one fixed by the tariff. When the carrier turned over the goods to Fink upon a mistaken understanding of the rate legally chargeable, both it and the consignee undoubtedly acted upon the belief that the charges collected were those authorized by law. Under such circumstances consistently with the

provisions of the Interstate Commerce Act the consignee was only entitled to the merchandise when he paid for the transportation thereof the amount specified as required by the statute. For the legal charges the carrier had a lien upon the goods, and this lien could be discharged and the consignee become entitled to the goods only upon tender or payment of this rate. Texas & Pacific Ry. Co. v. Mugg [& Dryden], 202 U.S. 242, 26 S.Ct. 628, 50 L.Ed. 1011. The transaction, in the light of the act, amounted to an assumption on the part of Fink to pay the only legal rate the carrier had the right to charge or the consignee the right to pay."

See also, Louisville & Nashville R. R. Co. v. Central Iron & Coal Co., 265 U.S. 59, 65, 44 S.Ct. 441, 68 L.Ed. 900.

The final contention is made that even if the defendant was obligated to pay the minimum price for the coal, Costanzo is not entitled to recover since it acted throughout as agent for the owners of the mines. The agreements between Costanzo and the producers of the coal clearly indicate that Costanzo was acting as their agent in the sales to Weirton; for while Costanzo agreed therein to guarantee all purchaser's accounts, it was expressly denominated sales agent and was promised compensation for handling and selling the coal, and agreed to make no contract of sale without the knowledge of its principal. On the other hand, the sales agreement of March 20, 1933, between Costanzo and Weirton denominated the former as the seller and the latter as the purchaser of the coal; and neither in this agreement nor in the subsequent renewals thereof is there any indication that the coal belonged to the producers and not to Costanzo, or that Costanzo was acting as agent for the producers in the transaction. In fact, Costanzo billed the coal in its own name and all payments were made to it. The transactions took this form although it was well known to Weirton that Costanzo was acting for the owners of the mines, and although Costanzo remitted to the producers the money received from Weirton less commissions.

If the suit had been based on the written contract and the renewal of 1940, there could have been no question that Costanzo, the agent, could have sued in its own name; for it is well established that if an agent discloses his principal when contracting for him, but executes the contract in his own name in such a manner that he is bound thereby, the other contracting party becomes liable to him and he may bring suit on the contract in his own name. So much the defendant admits, but nevertheless makes the contention that the present suit is not based upon the written contract but is brought in derogation thereof. There is no substance in the argument; for in the course of the dealings and communications between the parties and in the delivery of goods subject to the minimum price restriction, which gave rise to the implied contract on which the suit is based, Costanzo assumed the position of owner of the goods and therefore comes within the rule which permits an agent to bring suit in his own name.

In Mechem on Agency, 2d Ed., Vol. 2, § 2024, it is said:

"Where the contract is made with the agent as such but in such form as to appear to be made with him personally, whether as a result of an omission to disclose the fact of the agency or the name of the principal, or of a failure to use apt and sufficient language to bind the principal, the agent is, as has been seen, personally liable upon the contract, even though the principal also may in many cases be liable upon it. And this obligation is reciprocal,—the other party is bound to the agent, and in the latter vests a legal interest in the contract, and consequently, a right of action upon it, though his recovery is, of course, ordinarily for the benefit of the principal. It is, therefore, a general rule that where a contract, whether written or unwritten, entered into on account of the principal, is, in its terms, made with the agent personally, the agent may sue upon it at law. * * *"

See also, Fruit Growers' Express Co. v. Plate Ice Co., 4 Cir., 59 F.2d 605, certiorari denied 287 U.S. 642, 53 S.Ct. 91, 77 L.Ed 556; Rule 17(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c; 3 C.J.S. Agency, § 227; 2 Am. Jur. (Agency) §§ 344, 421 and 432.

The judgment of the District Court must be reversed and the case remanded for further proceedings in accordance with this opinion.

Reversed and remanded.