Madden, Judge,
delivered the opinion of the Court:
The plaintiff is a producer of bituminous coal. On June 18, 1931, it became a member of the Bituminous Coal Code, which was created by the Bituminous Coal Act of 1937.[1] In May 1940 the Post Office Department issued invitations for bids for the use of the post office at Cincinnati, Ohio. Section 6 of schedule 2 of the specifications, hereinafter quoted, showed that the purchasing agent of the Post Office Department, who prepared the specifications, was in doubt as to whether the Act applied to sales of coal to the Government, as there had been no judicial determination of that question. In fact, no such determination has «been made until now.
On May 31, 1940, the plaintiff, through its exclusive sales agent, submitted a bid of $2.50 per ton, f. o. b. dock, Traut-man, Ohio. On August 8, the Director of the Bituminous Coal Division in the Department of the Interior, which Division had succeeded, under one of the reorganization orders, to the functions of the Bituminous Coal Commission under the Act, issued an order making prices and marketing rules effective September 3. On August 9 the Government accepted the plaintiff’s bid. On August 14 the Director postponed the effective date of his August 8 order to October 1. Under the schedule of prices set by the Director, the minimum code price for the coal was $3.06 per ton. As we have said, the figure named in the plaintiff’s bid was $2.50 per ton.
On August 13 the Post Office Department issued a purchase order to the plaintiff for 3,000 tons of coal, under the contract, to be shipped on the order of the Cincinnati post *104 master. The plaintiff acknowledged the order, stating that it must charge code prices for any coal which it shipped after those prices became effective. As we have said, the prices were to go into effect October 1. The purchasing agent of the Post Office Department replied that the Comptroller General had ruled that the quoted price of $2.50 per ton was the price the Department must pay throughout the contract period. The question was argued in further correspondence between the parties, some of which is referred to hereinafter.
The Director, on September 25, 1940, ruled that coal that was delivered after October 1, the effective date of the code prices, was subject to those prices, even though contracted for before that date. The postmaster at Cincinnati gave his first order for coal under the contract on October 30, and then and thereafter 2,963.4 tons were ordered by him and delivered by the plaintiff. The plaintiff billed the Government at the code price of $3.06 per ton, but the Government paid only $2.50 per ton. The plaintiff accepted the lesser payment “on account,” and, after formal claim and the denial thereof by both the Post Office Department and the Comptroller General, this suit is brought for the difference of $1,508.30.
The plaintiff urges that the claim which this suit seeks to enforce (1) arises out of a contract with the United States, (2) is founded upon a law of Congress, the Bituminous Coal Act, and (3) is founded upon a regulation of an Executive Department, the Department of the Interior, made through the Bituminous Coal Division in that Department, and approved by the Secretary of the Interior. If any one of these contentions is correct, the court has jurisdiction.[2]
The Government denies our jurisdiction, asserting (1) that there was no contract, either express or implied in fact, which was in accord with the plaintiff’s claim, and that even if a private person in the Government’s circumstances would have been bound by a contract implied in law to pay the code price, we do not have jurisdiction of such nonconsentual contractual claims; (2) that no right in the plaintiff can be based upon the Bituminous Coal Act, or any regulation issued *105 pursuant to it, because (a) the act has no application to sales to the Government; and (b) even if it does apply to sales to the Government as well as others, it imposes no duty upon the Government, or any other buyer, to pay the code price, since it is aimed only at the conduct of the seller.
We consider first whether there was a contract, express or implied in fact, that the Government would pay the code price if it was judicially determined, after the contract was awarded, that the minimum prices under the Bituminous Coal Act of 1937 were applicable to contracts for furnishing coal to the United States Government. Our inquiry is as to the intention of the parties. The invitation for bids, in Article 6 of Schedule 2, contained the following language:
If on the date of opening of bids there has been no judicial determination that the minimum prices under the Bituminous Coal Act of 1937 are applicable to contracts for furnishing coal to the United States Government, contract will be awarded the lowest responsible bidder conforming to the specifications. However, if before award is made there shall have been judicial determination that minimum prices apply to contracts for the furnishing of coal to the United States Government, the right is reserved to accept the lowest responsible bid conforming to specifications and substitute the minimum prices established by the Bituminous Coal Division, provided the bidder’s price is less than the minimum fixed; or to reject all bids and readvertise.
The Government contends that this language negatives any intention that the code price, rather than the bid price, would be paid for the coal in the event which actually occurred, which was that no judicial determination had been made, at the date of the opening of bids, as to whether or not the Bituminous Coal Act was applicable to the transaction. A literal reading of this paragraph gives some plausibility to this contention. But when all the implications of such a construction are considered, it seems unlikely indeed that the Government’s agents who wrote the invitation for bids which became a part of the contract could have intended, by the language they used, what the Government now claims they intended.
The paragraph quoted shows an intention to scrupulously obey the law, in the making of the contract, if by the time of the making they had learned what the law was. The lan *106 guage used gives no indication that they had prejudged the legal issues. It gives no hint of the grounds of defense which the Government relies on in this suit. The idea advanced here that even if the law were to be held applicable to sales to the Government, yet the Government could, with impunity, buy below the code price since the code price would be binding only on the seller, is indeed negatived by the language quoted. It says that the Government will pay the code price if it is determined that the minimum prices “are applicable to contracts for furnishing coal to the United States.” It does not quibble about whether it is determined that, though the contractor is forbidden to sell, the United States is not forbidden to buy, or both are forbidden to engage in a sale and.purchase at prices below the minimum.
So we have an intent, expressed in words, that if the parties know what the law is when they sign their contract, they will conform the contract to the law. We are urged to find that the same parties intended that if the revelation of the law should come to them a day or a month or a year after the contract was signed and if the revelation was that the law was applicable to their transaction, they would, nevertheless, openly flout the law. We can imagine no rational basis for such an intent. For the contractor, it would have been contemplation of business suicide, since it would have exposed him to expulsion from code membership and to the prohibitive tax on nonmembers. For the agents of the Government, it would have meant that they and their Government would be, at the least, accessories to a violation of the law made by the Government. They would not have been putting themselves and their Government in this dishonorable position in order to save some dollars for the Government, since they had expressed complete willingness to pay the code minimum, even though it was higher than the low bid, if the answer to the legal question came by the time the bids were opened.
We think that the problem of the applicability or non-applicability of the Bituminous Coal Act to sales to the Government made it difficult to draft invitations to bid which would cover the situation that might be presented when that doubt was resolved; that the Government agents who wrote the proposed contract were used to merely issuing a stereo *107 typed form of proposal; that they could hardly imagine a contract which, after it was signed, would still contain, on its face, an unresolved question as to what the price would be; and that therefore they wrote the invitation so that, on its face, it would leave the price in doubt only down to the day of the opening of the bids. But, ás we have said, we think they did not mean thereby to bind themselves or the contractor to violate the law if they learned the law after the bids were opened. Language which, taken literally, may seem to have a plain meaning may be made ambiguous by the fact that that apparent plain meaning could hardly have been the meaning intended by rational persons, whose attitude to the situation, taken as a whole, belies the apparent plain meaning.
The intent of the Government not to participate in, or induce, a breach of its own laws if the proper interpretation of its laws should be determined before the contract was made, was shown, as we have seen, by the words of the invitation. We think that the circumstances, and the statements made by the agents of the Post Office Department, after the contract was signed, show that their intent, as to the meaning of the contract after its execution, was not different. The letter of August 28, 1940, referred to in finding 9, from the Department’s purchasing agent to the plaintiff, stated that by virtue of the Comptroller General’s decision to the effect that payment for coal could not be made at other than the quoted price, all coal had to be billed at the original quoted price throughout the contract period. The letter of September 20, 1940, also referred to in finding 9, from the Department’s purchasing agent to the plaintiff’s sales agent said that there was a difference of opinion between the Bituminous Coal Division and the Comptroller General as to whether sales of coal to the Federal Government were subject to the Act. It further said:
* * * obviously it is not the function of this Department to determine which version of the law is correct, and the specifications adopted by it to secure bids for furnishing coal have been designed to supply the needs of the Department for coal, in a manner which will not be violative of law, irrespective of what may be ultimately determined by the courts to be the law.
*108 Accordingly, I regret to inform yon that I cannot comply with your request, and the Department will expect strict compliance with the terms of its contract.
The statements in this letter show that the purchasing agent for the Post Office Department, when he drew the contract, intended to arrange for the needed supply of coal, and to pay the code price for it if it should be “ultimately determined by the courts to be the law” that the Bituminous Coal Act was applicable. There was no suggestion that, regardless of the law, the letter of the contract was to govern the price. It was natural that the purchasing agent should follow the Comptroller General’s ruling rather than that of the Bituminous Coal Division, in the absence of a court decision, since the former official had the power to disapprove the Department’s accounts, while the Division had no means of bringing pressure to bear. But the language of the letter shows that, if a court decision holding that the code prices were applicable to sales to the Government had been made while the coal was still being delivered under the contract, the purchasing agent would have expected to pay the code price for the coal furnished under the contract. The Comptroller General’s view as to the legal effect of the contract, which view was the basis for the Department’s refusal to pay the code price, is of no assistance to us in determining what the parties meant by the contract, since that official had no part in its making.
We conclude, therefore, that the contract, interpreted according to the intent of the parties, meant that the Government would pay the minimum code prices if it should be determined that those prices were made applicable by the Bituminous Coal Act to purchases of coal by the Government. We now consider whether the Act did apply. The Government denies that it did and relies principally upon the doctrine which is stated in a standard treatise as follows:[3]
General words in a statute do not include nor bind the government by whose authority the statute was enacted, where its sovereignty, rights, prerogatives, or interests are involved. It is bound only by being expressly named or by necessary implication from the terms and purpose of the act.
*109 The most commonly quoted judicial statement of the doctrine is that of Mr. Justice Clifford in United States v. Herron, 20 Wall. 251, 255:
Where an act of Parliament is made for the public good, as for the advancement of religion and justice, or to prevent injury and wrong, the king is bound by such act, though not particularly named therein; but where a statute is general, and thereby any prerogative, right, title, or interest is divested or taken from the king, in such case the king is not bound, unless the statute is made to extend to him by express words.
The decision in the Herron case was that a discharge in bankruptcy did not bar a suit by the United States against the bankrupt, who was surety on the bond of a public official. A recent consideration of the doctrine is in Nardone v. United States, 302 U. S. 379, the wire-tapping case. The two statements of doctrine above quoted are both sufficiently indefinite to leave much room for discussion as to whether the doctrine applies to any particular situation, such as the one presented by this case.
The Bituminous Coal Act was enacted-to relieve a chronically depressed, though large and essential, industry. Both proprietors and laborers, and numerous dependent communities, were the victims of this condition. The preamble of the Act[4] says:
Regulation of the sale and distribution in interstate commerce of bituminous coal is imperative for the protection of such commerce; there exist practices and methods of distribution and marketing of such coal that waste the coal resources of the Nation and disorganize, burden, and obstruct interstate commerce in bituminous coal, with the result that regulation of the prices thereof and of unfair methods of competition therein is necessary to promote interstate commerce in bituminous coal and to remove burdens and obstructions therefrom.
The “injury and wrong” which the Act was intended do prevent was the unrestrained competition which had driven down the price of coal. The Government had, along with other buyers of coal, profited, in its contracts for its supply *110 of coal, by this competition, by receiving low bids. Counsel for the Government urge that Congress, in enacting the Act, intended to retain this advantage to the Government as a purchaser of coal and to relieve the depressed industry only by raising prices for other purchasers. We think that Congress could hardly have entertained such an intention. The Government, as sovereign, would have been in direct conflict with the Government, as user of coal. It would have been busy policing code operators to see that they observed code prices and conditions, and at the same time giving its own patronage to noncode operators, who, because they did not observe code conditions, could underbid the code members. It would have been herding coal operators into membership in the code by a prohibitive tax on sales by nonmembers to outsiders but at the same time encouraging nonmembership by permitting sales to itself free of the coercive tax..
In addition to these inherent inconsistencies which tend to indicate that the Government did not intend to except itself from the operation of its statute, there are indications on the face of the statute that it was intended to be applicable to sales to the Government. Section 3 (e), 15 TJ. S. C. § 830 (e), provided that the excise tax of one cent a ton imposed by Section 3 (a) should not apply in the case of a sale of coal for the exclusive use of the United States or a state or subdivision thereof for use in the performance of governmental functions. If the Act had not been intended to be, in general, applicable to the United States, there would have been no reason for this express provision for exemption. Section 9 (c) of the Act, 15 U. S. C. § 839 (c), gave to an employee of a producer of coal for the use of the United States the right to seek a hearing by the Commission as to whether certain of the labor standards of the Act were being complied with by the producer. This also is some indication that Congress had no intention to exempt producers of coal for sale to the United States from the operation of the Act. The fact that the Bituminous Coal Division, which was charged with the administration of the Act, interpreted it as intended to apply to sales to the Government is of some assistance in the construction of the Act.
*111 We conclude, therefore, that the Act was applicable to sales of coal to the Government. We have construed the contract as obligating the Government to pay the minimum code price if the Act was applicable to the transaction. It follows that the plaintiff may recover the difference between the amount already received and the code price.
The plaintiff contends that even if the contract is construed as showing an intent to pay only $2.50 a ton for the coal, though a sale at that price was forbidden by the Act, and thus plaintiff could not recover under the terms of the contract, still it has a right to recover upon a claim founded upon a law of Congress, the Bituminous Coal Act. This contention amounts to an assertion that such a contract would be illegal, and that the plaintiff may recover the legal price, viz, the minimum code price, in spite of the contract. The Government makes the surprising answer to this contention that, in that situation, the law should leave the two participants in the wrongdoing where it finds them, with the plaintiff’s coal in the Government’s bin, partly unpaid for. When the doctrine, in pari delicto, was devised to enable courts to wash their hands of the distasteful function of compelling accountings such as those between highwaymen, its inventors could hardly have foreseen the day when a great government would invoke the doctrine in confession and avoidance of a claim founded upon its own laws. The plaintiff replies'that it was not equally guilty, and that, even if it had been, code prices are like freight rates, which, because of the. policy of nondiscrimination involved in their collection, the railroad can collect even in the face of an illegal contract to discriminate. In view of our interpretation of the contract, we need not examine these contentions further.
The plaintiff may recover $1,508.30.
It is so ordered.
Whitaker, Judge; and Littleton, Judge, concur.
Jones, Judge; and Whaley, Chief Justice, took no part in the decision of this case.

 28 U. S. C. § 250.

 Black, Construction and Interpretation of the Laws, 2nd Ed., 94.

 15 U. S. C. § 828.