Justice THOMAS,
dissenting.
Like THE CHIEF JUSTICE, I would have remanded this case to the lower courts to determine, under the proper standard, whether Wellness’ alter-ego claim is a Stem claim. See Stern v. Mar *1961 shall, 564 U.S. -, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). I write separately to highlight a few questions touching on the consent issue that merit closer attention than either the Court or THE CHIEF JUSTICE gives them.
I agree with THE CHIEF JUSTICE “that individuals cannot consent to violations of the Constitution, but this principle has nothing to do with whose interest the violated provision protects. Anytime the Federal Government acts in a manner inconsistent with the separation of powers, it acts in excess of its constitutional authority. That authority is carefully defined )?y the Constitution, and, except through Article V’s amendment process, that document does not permit individuals to bestow additional power upon the Government.
The majority today authorizes non-Article III courts to adjudicate, with consent, claims that we have held to require an exercise of the judicial power based on its assessment that few “structural interests” are implicated by consent to the adjudication of Stem claims. See ante, at 1941 - 1942, 1944. That reasoning is flawed. It matters not whether we think the particular violation threatens the structure of our Government. Our duty is to enforce the Constitution as written, not as revised by private consent, innocuous or otherwise. Worse, amidst the tempest over whether “structural interests” are implicated when an individual consents to adjudication of Stem claims by a non-Article III court, both the majority and THE CHIEF JUSTICE fail to grapple with the antecedent question: whether a violation of the Constitution has actually occurred. That question is a difficult one, and the majority makes a grave mistake by skipping over it in its quest to answer the question whether consent can authorize a constitutional violation. Because I would resolve this case on narrower grounds, I need not decide that question here. I nevertheless write separately to highlight the complexity of the issues the majority simply brushes past.
I
A
“The principle, that [the Federal Government] can exercise only the powers granted to it, ... is now universally admitted.” McCulloch v. Maryland, 4 Wheat. 316, 405, 4 L.Ed. 579 (1819). A corollary to this principle is that each branch of the Government is limited to the exercise of those powers granted to it. Every violation of the separation of powers thus involves an exercise of power in excess of the Constitution. And because the only authorities capable of granting power are the Constitution itself, and the people acting through the amendment process, individual consent cannot authorize the Government to exceed constitutional boundaries.
This does not mean, however, that consent is invariably irrelevant to the constitutional, inquiry. Although it may not authorize a constitutional violation, consent may prevent one from occurring in the first place. This concept is perhaps best understood with the example on which the majority and THE CHIEF JUSTICE bo.th rely: the right to a jury trial. Ante, at 1942 -1943 (majority opinion); ante, at 1955 -1956 (ROBERTS, C.J., dissenting).[1] *1962 Although the Government incurably contravenes the Constitution when it acts in violation of the jury trial right, our precedents permit the Government to convict a criminal defendant without a jury trial when he waives that right. See Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). The defen-' dant’s waiver is thus a form of consent that lifts a limitation on government action by satisfying its terms — that is, the right is exercised and honored, not disregarded. See Patton v. United States, 281 U.S. 276, 296-298, 50 S.Ct. 253, 74 L.Ed. 854 (1930), abrogated on other grounds by Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). Provided the Government otherwise acts within its powers, there is no constitutional violation.
B
Consent to the adjudication of Stem claims by bankruptcy courts is a far more complex matter than waiver of a jury trial. Two potential violations of the separation of powers occur whenever bankruptcy courts adjudicate Stem claims. First, the bankruptcy courts purport to exercise power that the Constitution vests exclusively in the judiciary, even though they are not Article III courts- because bankruptcy judges do not enjoy the tenure and salary protections required by Article III. See Art. Ill, § 1. Second, the bankruptcy courts act pursuant to statutory authorization that is itself invalid. For even when acting pursuant to an enumerated power, such as the bankruptcy power, Congress exceeds its authority when it purports to authorize a person or entity to perform a function that requires the exercise of a power vested elsewhere by the Constitution. See Whitman v. American Trucking Assns., Inc., 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001).
Rather than attempt to grapple with these problems, the majority seizes on some statements from Commodity Futures Trading Comm’n v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), to resolve the difficult constitutional issue before us. See ante, at 1942 -1944. But to the extent Schor suggests that individual consent could authorize non-Article III courts to exercise the judicial power, 478 U.S., at 850-851, 106 S.Ct. 3245 it was wrongly decided and should be abandoned. Consent to adjudication by non-Article III judges may waive whatever individual right to impartial adjudication Article III implies, thereby lifting that affirmative barrier on Government action. But non-Article III courts must still act within the bounds of their constitutional authority. That is, they must act through a power properly delegated to the Federal Government and not vested by the Constitution in a different governmental actor. Because the judicial power is vested exclusively in Article III courts, non-Article III courts may not exercise it.
Schor’s justification for authorizing such a transgression was that it judged the “practical effect [the allocation would] have on the constitutionally assigned role of the federal judiciary” not to be too great. Id., at 851, 106 S.Ct. 3245. But we “can[not] preserve a system of separation of powers on the basis of such intuitive judgments regarding ‘practical effects.’ ” Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 70, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (SCALIA, J., concurring in part and concurring in judgment). Put more starkly, “[t]o uphold” a violation of the Constitution because one perceives “the infraction assailed [a]s unimportant when compared *1963 with similar but more serious infractions which might be conceived ... is not to interpret that instrument, but to disregard it.” Patton, supra, at 292, 50 S.Ct. 253. Our Constitution is not a matter of convenience, to be invoked when we feel uncomfortable with some Government action and cast aside when we do not. See Perez v. Mortgage Bankers Assn., — U.S., at -, 135 S.Ct., at 1215 (THOMAS, J., concurring in judgment).
II
Properly understood, then, the answer to the consent question in this case depends on whether bankruptcy courts act within the bounds of their constitutional authority when they adjudicate Stem claims with the consent of the parties. In order to answer that question, we must consider what form of governmental power that type of adjudication requires and whether bankruptcy courts are qualified to exercise that power. Department of Transportation v. Association of American Railroads, — U.S., at -, 135 S.Ct., at 1253 (THOMAS, J., concurring in judgment).
Many Government functions “may be performed by two or more branches without either exceeding its enumerated powers under the Constitution.” Ante, at 1939 -1940. Certain core functions, however, demand the exercise of legislative, executive, or judicial power, and their allocation is controlled by the Vesting Clauses contained in the first three articles of the Constitution. Ibid. We have already held that adjudicating Stem claims, at least without consent of the parties, requires an exercise of the judicial power vested exclusively in Article III courts. Stern, 564 U.S., at -, 131 S.Ct., at 2614-2616. The difficult question presented by this case, which the Court glosses over, is whether the parties’ consent somehow transforms the nature of the power exercised.
A
As the concepts were understood at the time of the founding, the legislative, executive, and judicial powers played different roles in the resolution of cases and controversies. In this context, the judicial power is the power “to determine all differences according to the established law”; the legislative power is the power to make that “established law”; and the executive power is the power “to back and support the sentence, and to give it due execution.” J. Locke, Second Treatise of Civil Government §§ 124-126, pp. 62-63 (J. Gough ed. 1947) (Locke); see also Wayman v. Southard, 10 Wheat. 1, 46, 6 L.Ed. 253 (1825).
It should be immediately apparent that consent does not transform the adjudication of Stem claims into a function that requires the exercise of legislative or executive power. Parties by their consent do not transform the function of adjudicating controversies into the functions of creating rules or enforcing judgments.
The more difficult question is whether consent somehow eliminates the need for an exercise of the judicial power. Our precedents reveal that the resolution of certain eases or controversies requires the exercise of that power, but that others “may or may not” be brought “within the cognizance of [Article III courts], as [Congress] deem[s] proper.” Murray’s Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 284, 15 L.Ed. 372 (1856). The distinction generally has to do with the types of rights at issue. Disposition of private rights to life, liberty, and property falls within the core of the judicial power, whereas disposition of public rights does not. From that core of the judicial power, we have identified two narrow historical exceptions. Those exceptions, along with *1964 the treatment of cases or controversies not falling within that core, provide useful guidance for understanding whether bankruptcy courts’ adjudication of Stem claims with the consent of the parties requires the exercise of Article III judicial power.
1
Under our precedents, the three categories of cases that may be adjudicated by Article III courts but that do not demand the exercise of the judicial power are those arising in the territories, those arising in the Armed Forces, and those involving public-rights disputes. Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 63-67, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion).
The first two represent unique historical exceptions that tell us little about the overall scope of the judicial power. From an early date, this Court has long upheld laws authorizing the adjudication of cases arising in the territories in non-Article III “territorial courts” on the ground that such courts exercise power “conferred by Congress, in the execution of those general powers which [Congress] possesses over the territories of the United States.” American Ins. Co. v. 356 Bales of Cotton, 1 Pet. 511, 546, 7 L.Ed. 242 (1828) (Canter).[2] And the Court has upheld laws authorizing the adjudication of cases arising in the Armed Forces in non-Article III courts-martial, inferring from a constellation of constitutional provisions that Congress has the power to provide for the adjudication of disputes among the Armed Forces it creates and that Article III extends only to civilian judicial power. Dynes v. Hoover, 20 How. 65, 78-79, 15 L.Ed. 838 (1858). Whatever their historical validity, these precedents exempt cases arising in the territories and in the land and naval forces from Article III because of other provisions of the Constitution, not because of the definition of judicial power in Article III itself. See Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 576 (2007) (noting that both exceptions enjoy “special textual rationales that d[o] not spill over into other areas”).
The third category consists of so-called “public rights” cases. Unlike the other two categories, which reflect carve-outs from the core of the judicial power, this category describes cases outside of that core and therefore has more to tell us about the scope of the judicial power.
The distinction between disputes involving “public rights” and those involving “private rights” is longstanding, but the *1965 contours of the “public rights” doctrine have been the source of much confusion and controversy. See generally Granfinanciera, 492 U.S., at 66-70, 109 S.Ct. 2782 (opinion of SCALIA, J.) (tracing the evolution of the doctrine). Our cases attribute the doctrine to this Court’s mid-19th century decision, Murray’s Lessee, supra. In that case, the Court observed that there are certain cases addressing “public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, ■ but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.” Id., at 284 (emphasis added).
Historically, “public rights” were understood as “rights belonging to the people at large,” as distinguished from “the private unalienable rights of each individual.” Lansing v. Smith, 4 Wend. 9, 21 (N.Y.1829) (Walworth, C.). This distinction is significant to our understanding of Article III, for while the legislative and executive branches may dispose of public rights at will — including through non-Article III adjudications — an exercise of the judicial power is required “when the government want[s] to act authoritatively upon core private rights that had vested in a particular individual.” Nelson, supra, at 569; see B & B Hardware, Inc. v. Hargis Industries, Inc., — U.S., at -, 135 S.Ct., at 1316 (THOMAS, J., dissenting).
The distinction was well known at the time of the founding. In the tradition of John Locke, William Blackstone in his Commentaries identified the private rights to life, liberty, and property as the three “absolute” rights — so called because they “appertained] and belonged] to particular men ... merely as individuals,” not “to them as members of society [or] standing in various relations to each other” — that is, not dependent upon the will of the government. 1 W. Blackstone, Commentaries on the Laws of England 119 (1765) (Commentaries); see also Nelson, supra, at 567.[3] Public rights, by contrast, belonged to “the whole community, considered as a community, in its social aggregate capacity.” 4 Commentaries 5 (1769); see also Nelson, supra, at 567. As the modern doctrine of the separation -of powers emerged, “the courts became identified with the enforcement of private right, and administrative agencies with the execution of public policy.” Jaffe, The Right to Judicial Review I, 71 Harv. L. Rev. 401, 413 (1958).
The Founders carried this idea forward into the Vesting Clauses' of our Constitution. Those Clauses were understood to play a role in ensuring that the federal courts alone could act to deprive individuals of private rights because the power to act conclusively against those rights was the core of the judicial power. As one early treatise explained, the judiciary is “that department of the government to whom the protection of the rights of the individual is by the constitution especially confided.” 1 St. George Tucker, Blackstone’s Commentaries, App. 357 (1803).- If “public rights” were not thought to fall within the core of the judicial power, then that could explain why Congress would be able to perform or authorize non-Article III adjudications of public rights without transgressing Article Ill’s Vesting Clause.
*1966 Nineteenth-century American jurisprudence confirms that an exercise of the judicial power was thought to be necessary for the disposition of private, but not public, rights.[4] See B & B Hardware, — U.S., at -, 135 S.Ct., at 1316-1317. The treatment of land patents illustrates the point well: Although Congress could authorize executive agencies to dispose of public rights in land — often by means of adjudicating a claimant’s qualifications for a land grant under a statute — the United States had to go to the courts if it wished to revoke a patent. See generally Nelson, 107 Colum. L. Rev., at 577-578 (discussing land patents). That differential' treatment reflected the fact that, once “legal title passed out of the United States,” the patent “[ujndoubtedly” constituted “a vested right” and consequently could “only be divested according to law.” Johnson v. Towsley, 13 Wall. 72, 84-85, 20 L.Ed. 485 (1871). By contrast, a party who sought to protect only a “public right” in the land had no such vested right and could not invoke the intervention of Article III courts. See Smelting Co. v. Kemp, 104 U.S. 636, 647, 26 L.Ed, 875 (1882) (“It does not lie in the mouth of a stranger to the title to complain of the act of the government with respect to it”); see also Bagnell v. Broderick, 13 Pet. 436, 450, 10 L.Ed. 235 (1839) (refusing to examine the propriety of a land patent on the ground that “Congress has the sole power to declare the dignity and effect of titles emanating from the United States”).
Over time, the line between public and private rights has blurred, along with the Court’s treatment of the judicial power. See B & B Hardware, — U.S., at - -, -, 135 S.Ct., at 1315-1316, 1316-1317. The source of the confusion may be Murray’s Lessee — the putative source of the public rights doctrine itself. Dictum in the case muddles the distinction between private and public rights, and the decision is perhaps better read as an expression of the principle of sovereign immunity. Granfinanciera, 492 U.S., at 68-69, 109 S.Ct. 2782 (opinion of SCALIA, J.).[5] Some cases appear to have done just that, thus reading Murray’s Lessee to apply only in *1967 disputes arising between the Government and others. See, e.g., Crowell v. Benson, 285 U.S. 22, 50, 52 S.Ct. 285, 76 L.Ed. 598 (1932).
Another strain of cases has confused the distinction between private and public rights, with some cases treating public rights as the equivalent of private rights entitled to full judicial review, American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 108, 23 S.Ct. 33, 47 L.Ed. 90 (1902), and others treating what appear to be private rights as public rights on which executive action could be conclusive, see, e.g., Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 401-404, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); see also B & B Hardware, — U.S., at -, 135 S.Ct., at 1304 (observing that Sunshine Anthracite may reflect a unique historical exception for tax cases). Cf. Northern Pipeline, 458 U.S., at 84-85, 102 S.Ct. 2858 (plurality opinion) (discussing other cases that appear to reflect the historical distinction between private rights and rights created by Congress). Perhaps this confusion explains why the Court has more recently expanded the concept of public rights to include any right “so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary.” Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 593-594, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985). A return to the historical understanding of “public rights,” however, would lead to the conclusion that the inalienable core of the judicial power vested by Article III in the federal courts is the power to adjudicate private rights disputes.
2
■ Although Congress did not enact a permanent federal bankruptcy law until the late 19th century, it has assigned the adjudication of certain bankruptcy disputes to non-Artiele III actors since as early as 1800. Plank, Why Bankruptcy Judges Need Not and Should Not Be Article III Judges, 72 Am. Bankr. L. J. 567, 608 (1998) (describing the bankruptcy powers vested by Congress in non-Article III judges). Modern bankruptcy courts, however, adjudicate a far broader array of disputes than their earliest historical counterparts. And this Court has remained carefully noncommittal about the source of their authority to do so. See Northern Pipeline, 458 U.S., at 71, 102 S.Ct. 2858 (plurality opinion).
Applying the historical categories of cases discussed above, one can understand why. Bankruptcy courts clearly do not qualify as territorial courts or courts-martial, but they are not an easy fit in the “public rights” category, either. No doubt certain aspects of bankruptcy involve rights lying outside the core of the judicial power. The most obvious of these is the right to discharge, which a party may obtain if he satisfies certain statutory criteria. Ibid. Discharge is not itself a private right, but, together with the claims allowance process that precedes it, it can act conclusively on the core private rights of the debtor’s creditors. We have nevertheless implicitly recognized that the claims allowance process , may proceed in a bankruptcy court, as can any matter that would necessarily be resolved by that process, even one that affects core private rights. Stern, 564 U.S., at -, 131 S.Ct., at 2616-2617. For this reason, bankruptcy courts and their predecessors more likely enjoy a unique, textually based exception, much like territorial courts and courts-martial do. See id., at -, 131 S.Ct., at 2621 (SCALIA, J., concurring). That is, Article I’s Bankruptcy Clause serves to carve cases and controversies traditionally subject to resolution by bankruptcy commissioners out of Article III, giving Con *1968 gress the discretion, within those historical boundaries, to provide for their resolution outside of Article III courts.
3
Because Stem claims by definition fall outside of the historical boundaries of the bankruptcy carve-out, they are subject to Article III. This means that, if their adjudication requires the exercise of the judicial power, then only Article III courts may perform it.
Although Stem claims indisputably involve private rights, the “public rights” doctrine suggests a way in which party consent may transform the function of adjudicating Stem claims into one that does not require the exercise of the judicial power. The premise of the “public rights” doctrine, as described above, is not that public rights affirmatively require adjudication by some other governmental power, but that the Government has a freer hand when private rights are not at issue. Accordingly, this premise may not require the presence of a public right at all, but may apply equally to any situation in which private rights are not asserted.
Party consent, in turn, may have the effect of lifting that “private rights” bar, much in the way that waiver lifts the bar imposed by the- right to a jury trial. Individuals may dispose of their own private rights freely, without judicial intervention. A party who consents to adjudication of a Stem claim by a bankruptcy court is merely making a conditional surrender of whatever private right he has on the line, contingent on some future event — namely, that the bankruptcy court rules against him. Indeed, it is on this logic that the law has long encouraged and permitted private settlement of disputes, including through the action of an arbitrator not vested with the judicial power. See ante, at 1949 (ALITO, J., concurring in part and concurring in judgment); T. Cooley, Constitutional Limitations 399 (1868). Perhaps for this reason, decisions discussing the relationship between private rights and the judicial power have emphasized the “involuntary divestiture” of a private right. Newland v. Marsh, 19 Ill. 376, 382-383 (1857) (emphasis added).
But all of this does not necessarily mean that the majority has wound up in the right place by the wrong path. Even if consent could lift the private-rights barrier to non-judicial Government action, it would not necessarily follow that consent removes the Stem adjudication from the core of the judicial power. There may be other aspects of the adjudication that demand the exercise of the judicial power, such as entry of a final judgment enforceable without any further action by an Article III court. We have recognized that judgments entered by Article III courts bear unique qualities that spring from the exercise of the judicial power, Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218-219, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), and it may be that the entry of a final judgment bearing these qualities— irrespective of the subject matter of the dispute — is a quintessential judicial function. See ante, at 1958 -1959 (ROBERTS, C.J., dissenting). See generally Northern Pipeline, supra, at 85-86, and n. 38, 102 S.Ct. 2858 (plurality opinion) (distinguishing the agency orders at issue in Crowell from bankruptcy court orders on this ground). As Thomas Cooley explained in his influential treatise, “If the judges should sit to hear ... controversies [beyond their cognizance], they would not sit as a court; at the most they would be arbitrators only, and their ... decision could not be binding as a judgment, but only as an award.” Cooley, supra, at 399.[6]
*1969 Ultimately, this case implicates difficult questions about the nature of bankruptcy procedure, judicial power, and remedies. In particular, if we were to determine that current practice accords bankruptcy court judgments a feature that demands the exercise of the judicial power, would that mean that all bankruptcy judgments resolving Stem claims are void, or only that courts may not give effect to that single feature that triggers Article III? The parties have briefed none of these issues, so I do not resolve them. But the number and magnitude of these important questions— questions implicated by thousands of bankruptcy and magistrate judge decisions each year — merit closer attention than the majority has given them.
B
Even assuming we were to decide that adjudication of Stem claims with the consent of the parties does not require the exercise of the judicial power, that decision would not end the constitutional inquiry. As instrumentalities of the Federal Government, the bankruptcy courts must act pursuant to some' constitutional grant of authority. Even if the functions bankruptcy courts perform do not require an exercise of legislative, executive, or judicial power, we would need to identify the source of Congress’ authority to establish them and to authorize them to act.
The historical carve-outs for' territorial courts and courts-martial might provide some guidance. The Court has anchored Congress’ authority to create territorial courts in “the general right- of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States.” Canter, 1 Pet., at 546. And it has anchored. Congress’ authority to create courts-martial in Congress’ Article I powers concerning the Army and Navy, understood alongside the Sixth Amendment’s exception of “ ‘cases arising in the land or naval forces,’ ” from the grand jury requirement, and Article II’s requirement that the President serve as commander in chief. Dynes, 20 How., at 78-79.
Although our cases examining the constitutionality of statutes allocating the power to the bankruptcy courts have not considered the source of Congress’ authority to establish them, the obvious textual basis is the fourth clause of Article I, § 8, which empowers Congress to “establish ... uniform Laws on the subject of Bank *1970 ruptcies throughout the United States.”[7] But as with the other two historical carve-outs, Congress’ power to establish tribunals within that grant is informed by historical understandings of the bankruptcy power.[8] We have suggested that, under this historical understanding, Congress has the power to establish bankruptcy courts that exercise jurisdiction akin to that of bankruptcy commissioners in England, subject to review traditionally had in England. Ante, at 1950 -1952 (ROBERTS, C.J., dissenting). Although-Sierra claims, by definition, lie outside those historical boundaries, a historical practice of allowing broader adjudication by bankruptcy commissioners acting with the consent of the parties could alter the analysis. The parties once again do not brief these questions, but they merit closer attention by this Court.
'i* í ‡
Whether parties may consent to bankruptcy court adjudication of Stem claims is a difficult constitutional question. It turns on issues that are not adequately considered by the Court or briefed by the parties. And it cannot — and should not — be resolved through a cursory reading of Sckor, which itself is hardly a model of careful constitutional interpretation. For these reasons, I would resolve the case on the narrow grounds set forth in Part I of THE CHIEF JUSTICE’S opinion. I respectfully dissent.

. There is some dispute whether the guarantee of a jury trial protects an individual right, a structural right, or both, raising serious questions about how it should be treated under Commodity Futures Trading Comm’n v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). My view, which does not turn on such taxonomies, leaves no doubt: It is a “fundamental reservation of power in our constitutional structure,” Blakely v. Wash *1962 ington, 542 U.S. 296, 306, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), meaning its violation may not be authorized by the consent of the individual.

. Chief Justice Marshall's explanation in Canter has come under attack on the ground that it fails to clarify the precise constitutional status of the power exercised by the territorial courts. Lawson, Territorial Governments and the Limits of Formalism, 78 Cal. L. Rev. 853, 892 (1990) (criticizing it as “fatuous” dictum). On the one hand, some early evidence suggests that the courts were thought to be dealing primarily with local matters that lie beyond federal judicial cognizance. Pfander, Article I Tribunals, Article III Courts, and the Judicial Power of the United States, 118 Harv. L. Rev. 643, 706-711 (2004). Yet Canter involved a controversy indisputably capable of adjudication by Article III courts, because it both arose in admiralty and fell within the Supreme Court’s appellate jurisdiction. Pfander, supra, at 713-714, n. 314. The best explanation for this apparent tension is that territorial courts adjudicate matters that Congress may or may not assign to Article III courts, as it wishes. Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 575-576 (2007). To recognize Congress' discretion requires no distortion of the meaning of judicial power because Chief Justice Marshall’s reasoning has nothing to do with the intrinsic qualities of the adjudication itself — e.g., whether it involves “the stuff of the traditional actions at common law tried by the courts of Westminster in 1789,” Stern v. Marshall, 564 U.S. -, -, 131 S.Ct. 2594, 2609, 180 L.Ed.2d 475 (2011) (internal quotation marks omitted).

. The protection of private rights in the Anglo-American tradition goes back to at least Magna Carta. The original 1215 charter is replete with restrictions on the King's ability to proceed against private rights, including most notably the provision that "[n]o free man shall be taken, imprisoned, disseised, outlawed, banished, or in any way destroyed, ... except by the lawful judgment of his peers and by the law of the land.” A. Howard, Magna Carta: Text and Commentaiy 43 (1964).

, Contemporary state-court decisions provide even more explication of the distinction be-, tween public and private rights, and many expressly tie the distinction to the separation of powers. See, e.g., Newland v. Marsh, 19 Ill. 376, 383 (1857) (“The legislative power ... cannot directly reach the property or vested rights of the citizen, by providing for their forfeiture or transfer to another, without trial and judgment in the courts; for to do so, would be the exercise of a power which belongs to another branch of the government, and is forbidden to the legislature"); see also Gaines v. Gaines, 48 Ky. 295, 301 (1848) (describing the judiciary as “the tribunal appointed by the Constitution and the law, for the ascertainment of private rights and the redress of private wrongs”); State ex rel. Atty. Gen. v. Hawkins, 44 Ohio St. 98, 109, 5 N.E. 228, 232 (1886) ("[Pjower to hear and determine rights of property and of person between private parties is judicial, and can only be conferred on the courts”); see generally T. Cooley, Constitutional Limitations 175 (1868) (explaining that only the judicial power was thought capable of disposing of private rights).

. Another potential explanation is that Murray's Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 15 L.Ed. 372 (1856), recognized yet another special exception to Article Ill’s allocation of judicial power, applicable whenever the Government exercises its power of taxation. Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 588-589 (2007); see also B & B Hardware, Inc. v. Hargis Industries, Inc., - U.S., at -, 135 S.Ct., at 1316 (THOMAS, J., dissenting) (discussing other decisions that appear to rest on this exception). To the extent that Murray’s Lessee purported to recognize such an exception, however, it did so only in dictum after noting that the statute provided a mechanism for judicial review of the accounting decision on which the distress warrant was based. 18 How., at 280-281.

. Numerous 19th-century State Supreme Courts held unconstitutional laws authorizing *1969 individuals to consent to have their cases heard by an individual not qualified as a judge under provisions of State Constitutions similar to Article III, § 1. See, e.g., Winchester v. Ayres, 4 Greene 104 (1853); Haverly Invincible Mining Co. v. Howcutt, 6 Colo. 574, 575-576 (1883); Ex parte Alabama State Bar Assn., 92 Ala. 113, 8 So. 768 (1891); see also Cooley, Constitutional Limitations, at 399. Acknowledging the similarity between the practices under review and - the legitimate practice of private arbitration, many of these decisions premised their finding of unconstitutionality on the issuance of a judgment or other writ that only judges may issue. See, e.g., Bishop v. Nelson, 83 Ill. 601 (1876) (per curiam) ("This was not an arbitration ... but it was an attempt to confer upon [Mr. Wood] the power of a judge, to decide the pending case, and he did decide it, the court carrying out his decision by entering the judgment he had reached, and not [its] own judgment”); Van Slyke v. Trempealeau Cty. Farmers’ Mut. Fire Ins. Co., 39 Wis. 390, 393 (1876) ("We cannot look into the bill of exceptions or consider the order denying a new trial, because both are unofficial and devoid of judicial authority”); see also id., at 395-396 (tracing this rule back to English understandings of judicial power). These decisions treat the rule as a corollary to the rule that parties may not, by consent, confer jurisdiction. See, e.g., Higby v. Ayres, 14 Kan. 331, 334 (1875); Hoagland v. Creed, 81 Ill. 506, 507-508 (1876); see also Cooley, supra, at 399.

. In Northern Pipeline, the plurality ^ejected the argument that "Congress’ constitutional authority to establish 'uniform Laws on the subject of Bankruptcies throughout the United States’ carries with it an inherent power to establish legislative courts capable of adjudicating 'bankruptcy-related controversies.’ ” Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 72, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion) (citation omitted). In that context, however, it was considering whether Article III imposes limits on Congress’ bankruptcy power, id., at 73, 102 S.Ct. 2858 which is a distinct question from whether Congress has the power to establish bankruptcy courts as an antecedent matter, leaving aside any Article III limitations.

. I would be wary of concluding that every grant of lawmaking authority to Congress includes the power to establish "legislative courts” as part of its legislative scheme. Some have suggested that Congress’ authority to establish tribunals pursuant to substantive grants of authority is informed and limited by its Article I power to "constitute Tribunals inferior to the supreme Court,” U.S. Const., Art. I, § 8 cl. 9. See Pfander, 118 Harv. L. Rev., at 671-697.